Opinion
MOSK, J.
The First Amendment to the Constitution of the United States, one of the provisions of the Bill of Rights, states: “Congress shall make no law . . . abridging the freedom of speech, or of the press . . . .” (U.S. Const., 1st Amend.)
Article I of the Constitution of the State of California, entitled the Declaration of Rights, states in subdivision (a) of section 2: “Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.”
In Glickman v. Wileman Brothers & Elliott, Inc. (1997) 521 U.S. 457 [117 S.Ct. 2130, 138 L.Ed.2d 585] (hereafter sometimes Glickman), a case of first impression, the United States Supreme Court, by a bare five-to-four majority, concluded that a marketing order issued by the Secretary of Agriculture of the United States did not implicate any right to freedom of speech under the First Amendment by compelling funding of generic advertising—that is, advertising for a commodity as such, without reference to brand, etc.
*476 In this cause, itself a case of first impression, we consider whether a marketing order issued by the Secretary of Food and Agriculture of the State of California implicates any right to freedom of speech under either the First Amendment or article I by compelling funding of generic advertising.
As we shall explain, we conclude that the marketing order in question does not implicate any right to freedom of speech under the First Amendment, but does indeed implicate such a right under article I.
I
The background to this action—historical, statutory, and administrative—is as follows.
A
In the course of the Great Depression, Congress enacted the Agricultural Marketing Agreement Act of 1937 or the AMAA. (See generally Act of June 3, 1937, ch. 296, 50 Stat. 246 et seq., as amended, codified at 7 U.S.C. § 601 et seq.)
The AMAA declared, as one of Congress’s policies, the establishing and maintaining of orderly marketing conditions for agricultural commodities in order to raise and support prices for their producers.
To effectuate this policy, the AMAA authorized the Secretary of Agriculture of the United States to enter into “marketing agreements,” which are contract-like arrangements with the producers and handlers of agricultural commodities concerning marketing matters, and provided that the making of any such agreement should not be held violative of any federal antitrust law.
To the same end, the AMAA also authorized the Secretary of Agriculture to issue “marketing orders,” which are regulations governing marketing matters for the producers and handlers of agricultural commodities. It provided for participation in the administration of such orders by the regulated producers and handlers themselves. It substantially restricted the terms of such orders generally to the limitation on total quantity marketed, the allotment of amounts for purchase, the allotment of amounts for marketing, the determination of the existence and extent of any surplus, the establishment of reserve pools, and, impliedly, the institution of grading and standards and the conduct of research. It also mandated that the regulated producers and handlers had to contribute funds to cover related expenses. It authorized the secretary to terminate as well as issue such orders. It generally provided that no such order could become effective unless approved or *477 favored, as specified therein, by the regulated producers. Similarly, it generally provided that no such order could remain effective unless favored, as specified therein, by the regulated producers. It authorized the secretary to conduct referenda, expressly with regard to the coming into effect of such an order and impliedly with regard to its remaining in effect. In light of features of this sort, the mechanism of regulation that such an order sets up is, essentially, one of “self-regulation” by the regulated producers and handlers. (H.R.Rep. No. 99-271, 1st Sess., pt. 1, pp. 195-196 (1985), reprinted in 1985 U.S. Code Cong. & Admin. News, p. 1299.)
Since 1937, Congress has amended the AMAA on several occasions. As a general matter, the AMAA has retained the core of the provisions described above, but has expanded beyond their periphery. Notably, although it continues to restrict the terms of marketing orders for agricultural commodities that it authorizes the Secretary of Agriculture to impose, it now permits more than it did originally. Specifically, it today allows, among other terms, the undertaking of research and development projects, encompassing, for plums and 25 other specified commodities,[1] “any form of marketing promotion including paid advertising,” “the expense of’ which is “to be paid from funds collected pursuant to the marketing order” in question. (7 U.S.C. § 608c(6)(I).) It first allowed a term of this sort, albeit not extending to advertising, in 1954. It first allowed one extending to advertising for a single specified commodity in 1962. It then did the same for 14 specified commodities, including plums, in 1965. It did likewise for the remaining 11 specified commodities, one or more at a time, in 1970, 1971, 1978, 1980, 1983, 1988, and 1999. From all that appears, and plainly with respect to plums (see H.R.Rep. No. 89-846, 1st Sess., pp. 2-4 (1965), reprinted in 1965 U.S. Code Cong. & Admin. News, pp. 4143-4144), it has allowed terms extending to advertising in order to satisfy requests made by, among others, the regulated producers themselves.
Marketing Order No. 917 (see generally 7 C.F.R. § 917 (2000)), entitled the California Tree Fruit Agreement, was issued by the Secretary of Agriculture pursuant to the AMAA in various years in its various subparts, deriving ultimately from Marketing Order No. 36, issued in 1939. It presently applies to pears and peaches, and formerly applied to plums as well. It provides for the establishment of a “Control Committee,” whose members are drawn, largely if not exclusively, from the regulated producers and handlers themselves. It provides too for a “Commodity Committee” for each *478 of the fruits, which is effectively filled with or controlled by the regulated producers themselves. In addition, and among other things, it provides for the Control Committee’s administration of its terms. It also provides for each Commodity Committee’s undertaking of research and development projects, encompassing “any form of marketing promotion including paid advertising,” “the expenses of’ which “shall be paid from funds collected pursuant to” assessments imposed on the regulated handlers by the secretary, on the committee’s recommendation. (7 C.F.R. § 917.39 (2000) [presently, for pears and peaches]; 7 C.F.R. former § 917.39 (1991) [formerly, for plums as well]; see 7 C.F.R. § 917.37 (2000) [presently, for pears and peaches]; 7 C.F.R. former § 917.37 (1991) [formerly, for plums as well].) It has so provided for pears and peaches since 1976. It had done the same for plums since 1971. It sets out specific regulations regarding both fruit containers and packs.
Marketing Order No. 917 was terminated by the Secretary of Agriculture in 1991 as to plums because the results of a referendum conducted that year “demonstrated a lack of producer support. . . .” (56 Fed.Reg. 23773 (May 24, 1991).)
B
Also in the course of the Great Depression, indeed within days after Congress enacted the Agricultural Marketing Agreement Act of 1937 or the AMAA, the Legislature enacted the California Marketing Act of 1937 or the CMA. (See generally Stats. 1937, ch. 404, § 1, p. 1329 et seq., as amended, codified at Food & Agr. Code, § 58601 et seq.)
Like the AMAA, the CMA declared, as one of the Legislature’s policies, the establishing and maintaining of orderly marketing conditions for agricultural commodities in order to raise and support prices for their producers.
Also like the AMAA, the CMA authorized the Director of Agriculture of the State of California—who is now styled the Secretary of Food and Agriculture (Food & Agr. Code, § 50)—to enter into “marketing agreements,” i.e., contract-like arrangements with the producers and handlers of agricultural commodities concerning marketing matters, which would be binding, expressly, only on those signatory thereto, and would be exempt, impliedly, from all state antitrust laws.
Again like the AMAA, the CMA authorized the Director of Agriculture to issue “marketing orders,” i.e., regulations governing marketing matters for the producers and handlers of agricultural commodities, which did the *479 following: provided for participation in the administration of such orders by the regulated producers and handlers themselves; substantially restricted the terms of such orders generally to, among others, the determination of the existence and extent of any surplus, the limitation on total quantity marketed, the allotment of amounts for purchase, the allotment of amounts for marketing, the regulation of periods for marketing, the establishment of reserve pools, the institution of grading and standards, and, impliedly, the conduct of research; and mandated that the regulated producers and handlers had to contribute funds to cover related expenses. It contained provisions relating to the termination of such orders, their coming into effect, and their remaining in effect, and, impliedly, the conduct of referenda. In light of features of this sort, the mechanism of regulation that such an order sets up is, essentially, self-regulation by the regulated producers and handlers themselves. (See Voss v. Superior Court (1996) 46 Cal.App.4th 900, 907, 918-924 [54 Cal.Rptr.2d 225].)
But, unlike the AMAA, the CMA authorized the Director of Agriculture to impose, among the terms of such a marketing order, the establishment of “plans for advertising and sales promotion to create new or larger markets for agricultural commodities,” specifically, plans that are “directed toward increasing the sale of such commodity without reference to a particular brand,” etc. (Stats. 1937, ch. 404, § 1, pp. 1335-1336.) It mandated that the regulated producers and handlers subject to a marketing order with such a term had to contribute funds to cover related expenses.
Since 1937, the Legislature has amended the CMA on several occasions. As a general matter, the CMA has retained the core of the provisions described above, but has expanded beyond their periphery. Such expansion, however, is not worthy of note here.
In 1991, after the federal California Tree Fruit Agreement was terminated as to plums, there was no federal or state marketing agreement or order in place. The Secretary of Food and Agriculture then entered into a marketing agreement pursuant to the CMA with about 80 percent of the producers (apparently) and handlers of the fruit, evidently at their instigation, entitled the California Plum Marketing Agreement.
In 1992, the California Plum Marketing Agreement went into effect. It established a Plum Advisory Board, comprising producer-handlers and handlers, and authorized it to conduct research concerning plums and to engage in advertising, sales promotion, and market development. It was binding on its signatories only. It purportedly had several weaknesses, including an inability to require full participation, obtain adequate funding, and prevent *480 free riders, and also an absence of provisions for quality standards and inspections.
In 1993, a group of plum producers and handlers, which called itself the Stone Fruit Coalition, approached the Secretary of Food and Agriculture, and requested him to issue a marketing order pursuant to the CMA, specifically a marketing order that the group itself proposed. (Voss v. Superior Court, supra, 46 Cal.App.4th at p. 904.)
In 1994, the Secretary of Food and Agriculture issued a marketing order pursuant to the CMA, entitled the California Plum Marketing Program, which conformed to the one that the Stone Fruit Coalition proposed. (See Voss v. Superior Court, supra, 46 Cal.App.4th at pp. 904-906.)
The California Plum Marketing Program provides for the establishment of a California Plum Marketing Board, which is virtually filled with, and totally controlled by, producers and/or producer-handlers of the fruit. In addition, and among other things, it provides for the board’s administration of its terms. It also provides for the board’s undertaking of activities extending to research; advertising, specifically generic advertising, along with sales promotion and market development; and the institution and implementation of quality standards and inspections. It provides as well for the board’s assessment of funds from producers for expenses related to the foregoing activities, at a rate that may not exceed $0.20 per 28-pound box, including $0.02 for research, $0.11 for generic advertising along with sales promotion and market development, and $0.07 for quality standards and inspections.
II
On October 31, 1994, Gerawan Farming, Inc., filed a complaint for declaratory and injunctive relief in the Superior Court of Tulare County against, among others, the California Secretary of Food and Agriculture in his official capacity, originally Henry J. Voss, then Ann M. Veneman, now William J. Lyons, Jr. It challenged the California Plum Marketing Program, which was issued by the secretary pursuant to the CMA, under provisions including the free speech clause of the First Amendment to the United States Constitution and the free speech clause of subdivision (a) of section 2 of article I of the California Constitution. It alleged facts reflecting the historical, statutory, and administrative background, as set out above, relating to the AMAA and Marketing Order No. 917 and to the CMA and the California Plum Marketing Program. It also alleged facts, liberally construed, to the following effect: It produces and handles plums; plums constitute a lawful product; it has developed, and uses, a brand for marketing purposes; it *481 engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; nonetheless, the California Plum Marketing Program compels it to fund commercial speech in the form of generic advertising about plums as a commodity against its will, and does so to some appreciable extent; the compulsion of funding reduces the amount of money available for its own advertising; the generic advertising, otherwise undescribed, “reflect[s] . . . viewpoints,” political and ideological as well as commercial, “to which it does not subscribe,” and indeed with which it “vehemently disagrees.”
Subsequently, in Glickman, a majority of the United States Supreme Court, in an opinion by Justice Stevens, concluded that Marketing Order No. 917,' which was issued by the United States Secretary of Agriculture pursuant to the AMAA, did not implicate the right of parties including Gerawan to freedom of speech under the First Amendment by compelling funding of generic advertising. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 467-477 [117 S.Ct. at pp. 2137-2142].) They indicated that, had such a right been implicated, the appropriate standard for use in determining whether it had been violated would have been the test of Abood v. Detroit Board of Education (1977) 431 U.S. 209 [97 S.Ct. 1782, 52 L.Ed.2d 261] (hereafter sometimes Abood) and its progeny, including Keller v. State Bar of California (1990) 496 U.S. 1 [110 S.Ct. 2228, 110 L.Ed.2d 1] (hereafter sometimes Keller), which had not been used by the court below— which “involves] the compelled funding of speech” generally (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 474, fn. 18 [117 S.Ct. at p. 2141])—and not the test of Central Hudson Gas & Elec. v. Public Serv. Comm’n (1980) 447 U.S. 557 [100 S.Ct. 2343, 65 L.Ed.2d 341] (hereafter sometimes Central Hudson), which had been used by the court below— which “involve[s] a restriction on commercial speech” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 474, fn. 18 [117 S.Ct. at p. 2141]). In the principal dissenting opinion, Justice Souter concluded that the marketing order in question did indeed implicate a First Amendment right to freedom of speech, was subject to examination under the Central Hudson test, and did not survive muster thereunder. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 477-504 [117 S.Ct. at pp. 2142-2156] (dis. opn. of Souter, J.).) In a separate dissenting opinion, Justice Thomas generally joined in Justice Souter’s, but rejected the Central Hudson test, root and branch. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 504-506 [117 S.Ct. at pp. 2155-2156] (dis. opn. of Thomas, J.).)
The Secretary of Food and Agriculture moved for judgment on the pleadings on the ground that Gerawan’s complaint did not allege facts *482 sufficient to constitute a cause of action.[2] By order, the superior court granted the motion, but with leave to amend.
Gerawan proceeded to file an amended complaint. It challenged the California Plum Marketing Program under provisions including article I’s free speech clause. It again alleged facts reflecting the historical, statutory, and administrative background, as set out above. Expanding somewhat the facts that it alleged previously, it also alleged facts, liberally construed, to the following effect: It produces and handles plums; plums constitute a lawful product; it has developed, and uses, a brand for marketing purposes; it engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; nonetheless, the California Plum Marketing Program compels it to fund commercial speech in the form of generic advertising about plums as a commodity against its will, and does so in excess of $80,000 per year; the compulsion of funding reduces the amount of money available for its own advertising; it “disagrees” with, and indeed “abhors,” the generic advertising, otherwise undescribed, both on political and ideological grounds, as “socialistic” and “collectivist,” and also on commercial grounds, as “grouping all . . . plums as though they are the same” and as “embarrassingly silly, idiotic and/or totally ineffective.”
The Secretary of Food and Agriculture moved for judgment on the pleadings on the ground that Gerawan’s amended complaint, like its original one, did not allege facts sufficient to constitute a cause of action. By order, the superior court granted the motion, this time without leave to amend. It -stated that Gerawan “cite[d] no authority for its argument that the California Constitution extends protections against compelled speech . . . greater than those provided in the United States Constitution which the United States Supreme Court [in Glickman] has held were not violated by” Marketing Order No. 917, which it said was “not substantively distinguishable from” the California Plum Marketing Program. It rendered judgment in the secretary’s favor, and caused entry thereof.
After Gerawan filed a notice of appeal in the superior court, an appeal was docketed in the Court of Appeal for the Fifth Appellate District.
By a judgment announced in a unanimous opinion certified for publication, the Court of Appeal affirmed the judgment of the superior court. It *483 apparently subjected to independent review the superior court’s order granting the motion for judgment on the pleadings submitted by the Secretary of Food and Agriculture. It proceeded to sustain the order. It acknowledged that it found “persuasive some of the reasoning in Justice Souter’s dissent” in Glickman. It nevertheless concluded that the California Plum Marketing Program does not implicate Gerawan’s right to freedom of speech under the First Amendment’s free speech clause, as construed by the Glickman majority. It determined that article I’s free speech clause is not materially different from the First Amendment’s. It attempted to render article I’s free speech clause similar to the First Amendment’s by construing article I’s free speech clause as it believed other courts had construed the First Amendment’s. It construed article I’s free speech clause thus under a “so-called ‘principle of deference,’ ” which it said operates when a state constitutional provision is “ ‘similar’ ” in its “ ‘language’ ” to a federal constitutional one. (Quoting Raven v. Deukmejian (1990) 52 Cal.3d 336, 353 [276 Cal.Rptr. 326, 801 P.2d 1077].) On this basis, it concluded that the California Plum Marketing Program does not implicate Gerawan’s right to freedom of speech under article I’s free speech clause.
Gerawan filed a petition for review. We granted its application.
III
The issue that we address on review is whether the California Plum Marketing Program, issued by the California Secretary of Food and Agriculture pursuant to the CMA, implicates Gerawan’s right to freedom of speech under either the First Amendment to the United States Constitution or article I of the California Constitution by compelling funding of generic advertising.[3]
A
In the Bill of Rights, the First Amendment to the United States Constitution has stated since its ratification in 1791: “Congress shall make no law *484 . . . abridging the freedom of speech, or of the press . . . .” (U.S. Const., 1st Amend.)
Under the First Amendment’s free speech clause, “speech” includes written expression as well as spoken. (Barnes v. Glen Theatre, Inc. (1991) 501 U.S. 560, 576 [111 S.Ct. 2456, 2465-2466, 115 L.Ed.2d 504] (cone, opn. of Scalia, J.); see, e.g., Dallas v. Stanglin (1989) 490 U.S. 19, 25 [109 S.Ct. 1591, 1595, 104 L.Ed.2d 18].)
In terms, the First Amendment’s free speech clause prohibits the legislative branch of the government of the United States from making any “law . . . abridging the freedom of speech, or of the press.” (U.S. Const., 1st Amend.) In effect, it also bars the executive and judicial branches from taking any action with similar consequence. (New York Times Co. v. United States (1971) 403 U.S. 713, 715-717 [91 S.Ct. 2140, 2142-2143, 29 L.Ed.2d 822] (cone. opn. of Black, J.); see Hudgens v. NLRB (1976) 424 U.S. 507, 513 [96 S.Ct. 1029, 1033, 47 L.Ed.2d 196] [stating that “[i]t is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee . . . against abridgment by government,” including the “federal” “government,” and not merely its legislative branch].)
Initially, the First Amendment’s free speech clause constrained only the United States and its government. (See Barron v. Baltimore (1833) 32 U.S. (7 Pet.) 243, 247-250 [8 L.Ed. 672, 674-675].) Today, through the Fourteenth Amendment’s due process clause, it also constrains the several states and their governments. (E.g., McIntyre v. Ohio Elections Comm’n (1995) 514 U.S. 334, 336, fn. 1 [115 S.Ct. 1511, 1514, 131 L.Ed.2d 426]; City of Ladue v. Gilleo (1994) 512 U.S. 43, 45, fn. 1 [114 S.Ct. 2038, 2040, 129 L.Ed.2d 36]; Near v. Minnesota (1931) 283 U.S. 697, 707 [51 S.Ct. 625, 627-628, 75 L.Ed. 1357]; Gitlow v. New York (1925) 268 U.S. 652, 666 [45 S.Ct. 625, 629-630, 69 L.Ed. 1138]; see Hudgens v. NLRB, supra, 424 U.S. at p. 513 [96 S.Ct. at p. 1033] [stating that “[i]t is, of course, a commonplace that the constitutional guarantee of free speech is a guarantee . . . against abridgment by government,” including “state” “government,” and not merely its legislative branch].)
The First Amendment’s free speech clause specifies a “right to freedom of speech.” (E.g., Bill Johnson’s Restaurants, Inc. v. NLRB (1983) 461 U.S. 731, 743 [103 S.Ct. 2161, 2170, 76 L.Ed.2d 277]; accord, e.g., Spallone v. United States (1990) 493 U.S. 265, 274 [110 S.Ct. 625, 631, 107 L.Ed.2d 644].) It does so not explicitly but by implication, containing, as it does, only the phrase “freedom of speech” and not the word “right.” (U.S. Const., 1st Amend.) It does not so much grant a right to freedom of speech, as it *485 “safeguards” some such right “against encroachment” (Palko v. Connecticut (1937) 302 U.S. 319, 324 [58 S.Ct. 149, 151, 82 L.Ed. 288], overruled on another point, Benton v. Maryland (1969) 395 U.S. 784, 794 [89 S.Ct. 2056, 2062, 23 L.Ed.2d 707]).
The First Amendment’s right to freedom of speech does not restrict itself “depending] upon the identity” or legal character of the speaker, “whether corporation, association, union, or individual.” (First National Bank of Boston v. Bellotti (1978) 435 U.S. 765, 777 [98 S.Ct. 1407, 1416, 55 L.Ed.2d 707]; accord, Pacific Gas & Elec. Co. v. Public Util. Comm’n (1986) 475 U.S. 1, 8 [106 S.Ct. 903, 907-908, 89 L.Ed.2d 1] (plur. opn. of Powell, J.); Consolidated Edison Co. v. Public Serv. Comm’n (1980) 447 U.S. 530, 533 [100 S.Ct. 2326, 2330-2331, 65 L.Ed.2d 319]; see Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 756 [96 S.Ct. 1817, 1822-1823, 48 L.Ed.2d 346].) What matters, rather, is the speech itself. (See Consolidated Edison Co. v. Public Serv. Comm’n, supra, 447 U.S. at p. 533 [100 S.Ct. at pp. 2330-2331]; First National Bank of Boston v. Bellotti, supra, 435 U.S. at p. 777 [98 S.Ct. at p. 1416].) That is because the right’s “protection” is “afforded” not only to one who speaks but also to those who listen. (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 756 [96 S.Ct. at pp. 1822-1823]; see Pacific Gas & Elec. Co. v. Public Util. Comm’n, supra, 475 U.S. at p. 8 [106 S.Ct. at pp. 907-908] (plur. opn. of Powell, J.).) When the interests served by the speech at issue extend beyond those of the speaker to those of the listeners, the speaker, whoever or whatever it may be, may be deemed to possess the right in question. (See Pacific Gas & Elec. Co. v. Public Util. Comm’n, supra, 475 U.S. at p. 8 [106 S.Ct. at pp. 907-908] (plur. opn. of Powell, J.); Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 756 [96 S.Ct. at pp. 1822-1823]; Consolidated Edison Co. v. Public Serv. Comm’n, supra, 447 U.S. at p. 533 [100 S.Ct. at pp. 2330-2331]; First National Bank of Boston v. Bellotti, supra, 435 U.S. at p. 777 [98 S.Ct. at p. 1416].)
In its nature, however, the First Amendment’s right to freedom of speech is not absolute. (E.g., Board of Comm’rs, Wabaunsee Cty. v. Umbehr (1996) 518 U.S. 668, 675 [116 S.Ct. 2342, 2347, 135 L.Ed.2d 843]; Chaplinsky v. New Hampshire (1942) 315 U.S. 568, 571 [62 S.Ct. 766, 768-769, 86 L.Ed. 1031].) Thus, it is not the case that “where [it] exists it must prevail. . . .” (Konigsberg v. State Bar (1961) 366 U.S. 36, 49 [81 S.Ct. 997, 1006, 6 L.Ed.2d 105].)
Moreover, in its range, the First Amendment’s right to freedom of speech is not unbounded. (See, e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc. (1995) 515 U.S. 557, 566 [115 S.Ct. 2338, *486 2343-2344, 132 L.Ed.2d 487]; Hudgens v. NLRB, supra, 424 U.S. at p. 513 [96 S.Ct. at p. 1033].) That is to say, it does not run against the world, but only against governmental actors as opposed to private parties. (E.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., supra, 515 U.S. at p. 566 [115 S.Ct. at pp. 2343-2344]; Hudgens v. NLRB, supra, 424 U.S. at p. 513 [96 S.Ct. at p. 1033].)
Also, in its scope, the First Amendment’s right to freedom of speech is not unlimited. (E.g., Kingsley Books, Inc. v. Brown (1957) 354 U.S. 436, 441 [77 S.Ct. 1325, 1327-1328, 1 L.Ed.2d 1469]; Near v. Minnesota, supra, 283 U.S. at p. 716 [51 S.Ct. at p. 631].) Indeed, it was “not intended” to embrace all subjects. (Roth v. United States (1957) 354 U.S. 476, 483 [77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498]; see, e.g., Chaplinsky v. New Hampshire, supra, 315 U.S. at p. 572 [62 S.Ct. at p. 769] [holding that the right in question does not protect “ ‘fighting’ words,” which “by their very utterance inflict injury or tend to incite an immediate breach of the peace”]; R. A. V. v. St. Paul (1992) 505 U.S. 377, 383 [112 S.Ct. 2538, 2543, 120 L.Ed.2d 305] [following Chaplinsky].)
Fewer than 60 years ago, the United States Supreme Court introduced a dichotomy in the jurisprudence of the First Amendment’s free speech clause between commercial speech, on the one side, and noncommercial speech, including that which is political or ideological in character, on the oilier.
“Commercial speech,” at its core, is speech that does “no more than propose a commercial transaction” {Pittsburgh Press Co. v. Human Rel. Comm’n (1973) 413 U.S. 376, 385 [93 S.Ct. 2553, 2558, 37 L.Ed.2d 669]), and, more broadly, is speech that goes beyond proposing such a transaction but yet “relatefs] solely to the economic interests of the speaker and its audience” (Central Hudson Gas & Elec. v. Public Serv. Comm’n, supra, 447 U.S. at p. 561 [100 S.Ct. at p. 2349]). (Cincinnati v. Discovery Network, Inc. (1993) 507 U.S. 410, 420-423 [113 S.Ct. 1505, 1511-1513, 123 L.Ed.2d 99].)
By contrast, “political speech” is speech that deals with “ ‘governmental affairs’ ” {First National Bank of Boston v. Bellotti, supra, 435 U.S. at p. 777 [98 S.Ct. at p. 1416], and “ideological speech” {Schad v. Mount Ephraim (1981) 452 U.S. 61, 65 [101 S.Ct. 2176, 2181, 68 L.Ed.2d 671]) is speech that apparently concerns itself with “philosophical,” “social,” “artistic,” “economic,” “literary,” “ethical,” and similar matters {Abood v. Detroit Board of Education, supra, 431 U.S. at p. 231 [97 S.Ct. at p. 1797] [considering the First Amendment’s right to “freedom” of “association,” which is evidently embraced by its right to freedom of speech]).
*487 The First Amendment’s right to freedom of speech protects political speech. (Schad v. Mount Ephraim, supra, 452 U.S. at p. 65 [101 S.Ct. at p. 2181].) It likewise protects ideological speech. {Ibid.)
The First Amendment’s right to freedom of speech also protects commercial speech. (E.g., Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 761-770 [96 S.Ct. at pp. 1825-1830].) But it protects it, as it were, only somewhat (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 758 [96 S.Ct. at pp. 1823-1824]) in comparison with noncommercial speech (Florida Bar v. Went For It, Inc. (1995) 515 U.S. 618, 623 [115 S.Ct. 2371, 2375-2376, 132 L.Ed.2d 541]; Zauderer v. Office of Disciplinary Counsel (1985) 471 U.S. 626, 637 [105 S.Ct. 2265, 2274, 85 L.Ed.2d 652]; Central Hudson Gas & Elec. v. Public Serv. Comm’n, supra, 447 U.S. at pp. 563-564 [100 S.Ct. at p. 2350]), including that which is political or, evidently, ideological in character (see Dun & Bradstreet, Inc. v. Greenmoss Builders (1985) 472 U.S. 749, 758, fn. 5 [105 S.Ct. 2939, 2944-2945, 86 L.Ed.2d 593] (plur. opn. of Powell, J.)).
When the United States Supreme Court introduced its commercial speech/ noncommercial speech dichotomy in First Amendment jurisprudence fewer than 60 years ago, it held that the First Amendment’s right to freedom of speech did not protect commercial speech at all. (Valentine v. Chrestensen (1942) 316 U.S. 52, 54-55 [62 S.Ct. 920, 921-922, 86 L.Ed. 1262].) When it revisited the issue somewhat more than 30 years later, it held that the right in question did, in fact, protect such speech (Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 761-770 [96 S.Ct. at pp. 1825-1830]), albeit, as stated, only somewhat. The right affords such protection as it does to “truthful and nonmisleading . . . messages about lawful products and services.” (44 Liquormart, Inc. v. Rhode Island (1996) 517 U.S. 484, 496 [116 S.Ct. 1495, 1504, 134 L.Ed.2d 711] (plur. opn. of Stevens, J.).) It affords none whatsoever to other sorts of messages about other sorts of products or services. (See Central Hudson Gas & Elec. v. Public Serv. Comm’n, supra, 447 U.S. at p. 563 [100 S.Ct. at p. 2350].)
The First Amendment’s right to freedom of speech is implicated, of course, in the act of speaking. The relationship is tight and direct. The right in question comprises both a “right to speak freely” and also a “right to refrain from” doing so “at all.” (Wooley v. Maynard (1977) 430 U.S. 705, 714 [97 S.Ct. 1428, 1435, 51 L.Ed.2d 752]; accord, Riley v. National Federation of Blind (1988) 487 U.S. 781, 796-797 [108 S.Ct. 2667, 2677-2678, 101 L.Ed.2d 669]; Harper & Row v. Nation Enterprises (1985) 471 U.S. 539, 559 [105 S.Ct. 2218, 2229-2230, 85 L.Ed.2d 588]; Board of Education v. Barnette (1943) 319 U.S. 624, 633-634 [63 S.Ct. 1178, 1182-1183, 87 L.Ed. 1628, 147 A.L.R. 674].) For speech results from what a *488 speaker chooses to say and what he chooses not to say. (See Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., supra, 515 U.S. at p. 573 [115 S.Ct. at p. 2347]; Riley v. National Federation of Blind, supra, 487 U.S. at pp. 796-797 [108 S.Ct. at pp. 2677-2678]; Pacific Gas & Elec. Co. v. Public Util. Comm’n, supra, 475 U.S. at p. 11 [106 S.Ct. at p. 909] (plur. opn. of Powell, J.).) Hence, the right in question is put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say.
The First Amendment’s right to freedom of speech may also be implicated in the use of money. The relationship is looser and less direct. (See, e.g., Board of Regents of the University of Wisconsin System v. Southworth (2000) 529 U.S. 217, 227-236 [120 S.Ct. 1346, 1353-1357, 146 L.Ed.2d 193]; Nixon v. Shrink Missouri Government PAC (2000) 528 U.S. 377, 385-386 [120 S.Ct. 897, 903-905, 145 L.Ed.2d 886]; Buckley v. Valeo (1976) 424 U.S. 1, 18-23 [96 S.Ct. 612, 634-637, 46 L.Ed.2d 659] (per curiam)', see also Secretary of State of Md. v. J. H. Munson Co. (1984) 467 U.S. 947, 967, fn. 16 [104 S.Ct. 2839, 2852-2853, 81 L.Ed.2d 786].) But it is real all the same. That is because “money,” even if it “is not” itself “speech” (Nixon v. Shrink Missouri Government PAC, supra, 528 U.S. at pp. 398-399 [120 S.Ct. at p. 910] (cone. opn. of Stevens, J.); accord, id. at p. 400 [120 S.Ct. at p. 911] (cone. opn. of Breyer, J.)), nevertheless “enables speech” (id. at p. 400 [120 S.Ct. at p. 911] (cone. opn. of Breyer, J.)). Just as speech results from what a speaker chooses to say and what he chooses not to say, so too it results from what speech a speaker chooses to fund and what speech he chooses not to fund. The right in question comprises both a right to fund speech meaningfully (see, e.g., Citizens Against Rent Control v. Berkeley (1981) 454 U.S. 290, 300 [102 S.Ct. 434, 439-440, 70 L.Ed.2d 492]; First National Bank of Boston v. Bellotti, supra, 435 U.S. at pp. 775-786 [98 S.Ct. at pp. 1415-1421]) and also a right to refrain from doing so altogether (see, e.g., Lehnert v. Ferris Faculty Assn. (1991) 500 U.S. 507, 516-517 [111 S.Ct. 1950, 1957-1958, 114 L.Ed.2d 572]; Keller v. State Bar of California, supra, 496 U.S. at pp. 9-17 [110 S.Ct. at pp. 2233-2238]; see also Machinists v. Street (1961) 367 U.S. 740, 746-770 [81 S.Ct. 1784, 1788-1801, 6 L.Ed.2d 1141] [statutory construction under the shadow of, inter alia, the First Amendment’s right to freedom of speech]; cf. Abood v. Detroit Board of Education, supra, 431 U.S. at p. 222 [97 S.Ct. at pp. 1792-1793] [considering the First Amendment’s right to association]). For, in words written by Thomas Jefferson specifically about religious speech, but with general applicability, “to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves and abhors, is sinful and tyrannical . . . .” (Jefferson, A Bill for Establishing Religious Freedom (June 12, 1779), reprinted in 5 The Founders’ Constitution (Kurland & *489 Lemer edits. 1987) p. 77.) Hence, it is put at risk both by prohibiting a speaker from funding speech that he otherwise would fund and also by compelling him to fund speech that he otherwise would not fund.
B
Comprising the Declaration of Rights, article I of the California Constitution states in subdivision (a) of section 2: “Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press.”
Article I’s free speech clause took its present language and designation in 1980. (Cal. Const., art. I, § 2, subd. (a), as amended June 3, 1980.) From there, it traces itself back to 1974, with the same language, but with a different designation as section 2. (Id., art. I, § 2, added Nov. 5, 1974.) Then to 1879, when the present California Constitution was framed, with a different designation as section 9, but with almost the same language: “Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.” (Id., art. I, former § 9 (as adopted May 7,1879).) And then to 1849, when the original California Constitution was framed, with the same language and designation. (Cal. Const, of 1849, art. I, § 9.)
Article I’s free speech clause finds its prehistory outside of California in the New York Constitution (Los Angeles Alliance for Survival v. City of Los Angeles (2000) 22 Cal.4th 352, 366, fn. 9 [93 Cal.Rptr.2d 1, 993 P.2d 334]) and ultimately, perhaps, in Blackstone’s Commentaries on the Laws of England (Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at p. 366, fn. 9; Dailey v. Superior Court (1896) 112 Cal. 94, 98 [44 P. 458]). But not in the First Amendment to the United States Constitution. (E.g., Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 908 [153 Cal.Rptr. 854, 592 P.2d 341], affd. sub nom. Pruneyard Shopping Center v. Robins (1980) 447 U.S. 74 [100 S.Ct. 2035, 64 L.Ed.2d 741]; see, e.g., Grodin, Some Reflections on State Constitutions (1988) 15 Hastings Const. L.Q. 391, 395.)
Although the designation of article I’s free speech clause has changed appreciably over the years, from section 9 to section 2 to subdivision (a) of section 2, its language has not. (See Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at pp. 365-366.)
It is beyond peradventure that article I’s free speech clause enjoys existence and force independent of the First Amendment’s. In section 24, *490 article I states, in these very terms, that “[r]ights guaranteed by [the California] Constitution are not dependent on those guaranteed by the United States Constitution.” This statement extends to all such rights, including article I’s right to freedom of speech. For the California Constitution is now, and has always been, a “document of independent force and effect particularly in the area of individual liberties.” {People v. Hannon (1977) 19 Cal.3d 588, 607, fn. 8 [138 Cal.Rptr. 885, 564 P.2d 1203] [speaking specifically of the present California Constitution]; accord, e.g., People v. Brisendine (1975) 13 Cal.3d 528, 549-550 [119 Cal.Rptr. 315, 531 P.2d 1099].)
Article I’s free speech clause is at least as broad as the First Amendment’s, and its right to freedom of speech is at least as great. (See, e.g., Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at pp. 366-367; Griset v. Fair Political Practices Com. (1994) 8 Cal.4th 851, 866, fn. 5 [35 Cal.Rptr.2d 659, 884 P.2d 116]; Blatty v. New York Times Co. (1986) 42 Cal.3d 1033, 1041 [232 Cal.Rptr. 542, 728 P.2d 1177]; Spiritual Psychic Science Church v. City of Azusa (1985) 39 Cal.3d 501, 519 [217 Cal.Rptr. 225, 703 P.2d 1119]; San Jose Mercury-News v. Municipal Court (1982) 30 Cal.3d 498, 508 [179 Cal.Rptr. 772, 638 P.2d 655]; People v. Glaze (1980) 27 Cal.3d 841, 844, fn. 2 [166 Cal.Rptr. 859, 614 P.2d 291]; Robins v. Pruneyard Shopping Center, supra, 23 Cal.3d at p. 908; Wilson v. Superior Court (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116]; Dailey v. Superior Court, supra, 112 Cal. at p. 98.)
Hence, as to the points noted in our discussion of the First Amendment’s free speech clause and its right to freedom of speech, article I’s free speech clause and its right to freedom of speech, mutatis mutandis, are at least in accord.
Thus, under article I’s free speech clause, as under the First Amendment’s, “speech” includes written expression as well as spoken. Indeed, under article I’s free speech clause, it does so in terms. (Cal. Const., art. I, § 2, subd. (a).)
Also, article I’s right to freedom of speech, like the First Amendment’s, does not restrict itself depending upon the identity or legal character of the speaker. (See Jacoby v. State Bar (1977) 19 Cal.3d 359, 363, fn. 2, & 368 [138 Cal.Rptr. 77, 562 P.2d 1326, 4 A.L.R.4th 273] [semble]; People v. American Automobile Ins. Co. (1955) 132 Cal.App.2d 317, 322, 328 [282 P.2d 559] [semble].) What matters is the speech itself. (See Jacoby v. State Bar, supra, 19 Cal.3d at pp. 363, fn. 2, & 368.) That is because the right’s protection is afforded not only to one who speaks but also to those who listen. {Ibid.) When the interests served by the speech at issue extend beyond *491 those of the speaker to those of the listeners, the speaker, we think, whoever or whatever it may be, may be deemed to possess the right in question.
Article I’s right to freedom of speech, like the First Amendment’s, is implicated in speaking itself. Because speech results from what a speaker chooses to say and what he chooses not to say, the right in question comprises both a right to speak freely and also a right to refrain from doing so at all, and is therefore put at risk both by prohibiting a speaker from saying what he otherwise would say and also by compelling him to say what he otherwise would not say.
Similarly, article I’s right to freedom of speech, like the First Amendment’s, may also be implicated in the use of money. Because speech results, through money’s enabling, from what speech a speaker chooses to fund and what speech he chooses not to fund, the right in question comprises both a right to fund speech meaningfully and also a right to refrain from doing so altogether, and is therefore put at risk both by prohibiting a speaker from funding speech that he otherwise would fund and also by compelling him to fund speech that he otherwise would not fund.
As a general rule, however, article I’s free speech clause and its right to freedom of speech are not only as broad and as great as the First Amendment’s, they are even “broader” and “greater.” (Dailey v. Superior Court, supra, 112 Cal. at p. 98; accord, Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at pp. 366-367; see, e.g., Griset v. Fair Political Practices Com., supra, 8 Cal.4th at p. 866, fn. 5; Blatty v. New York Times Co., supra, 42 Cal.3d at p. 1041; Spiritual Psychic Science Church v. City of Azusa, supra, 39 Cal.3d at p. 519; San Jose Mercury-News v. Municipal Court, supra, 30 Cal.3d at p. 508; People v. Glaze, supra, 27 Cal.3d at p. 844, fn. 2; Robins v. Pruneyard Shopping Center, supra, 23 Cal.3d at p. 908; Wilson v. Superior Court, supra, 13 Cal.3d at p. 658.)
It is, of course, true that this general rule does not preclude the possibility of exception. (See Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at p. 367.)
But, at least in the following particulars, it is indeed the general rule, and not any exception, that applies.
First, article I’s free speech clause, unlike the First Amendment’s, specifies a “right” to freedom of speech explicitly and not merely by implication. (Friesen, Should California’s Constitutional Guarantees of Individual Rights Apply Against Private Actors? (1989) 17 Hastings Const. L.Q. 111, 118, *492 119-122; Note, Rediscovering the California Declaration of Rights (1974) 26 Hastings L.J. 481, 494; see Crosby, New Frontiers: Individual Rights Under the California Constitution (1989) 17 Hastings Const. L.Q. 81, 81-82.) Article I and the First Amendment are not dissimilar in providing, in the First Amendment’s words, that “Congress shall make no law . . . abridging the freedom of speech, or of the press” (U.S. Const., 1st Amend.), and, in article I’s, that “[a] law may not restrain or abridge liberty of speech or press” (Cal. Const., art. I, § 2, subd. (a)). But, otherwise, article I and the First Amendment are altogether different, because only article I, and not the First Amendment, affirmatively declares as a “right” that “[e]very person may freely speak, write and publish his or her sentiments on all subjects” (Cal. Const., art. I, § 2, subd. (a)), (Crosby, New Frontiers: Individual Rights Under the California Constitution, supra, 17 Hastings Const. L.Q. at pp. 81-82; Friesen, Should California’s Constitutional Guarantees of Individual Rights Apply Against Private Actors?, supra, 17 Hastings Const. L.Q. at pp. 118, 119-122; see Fritz, More Than “Shreds and Patches”: California’s First Bill of Rights (1989) 17 Hastings Const. L.Q. 13, 22, 23, 31; Note, Rediscovering the California Declaration of Rights, supra, 26 Hastings L.J. at pp. 493-495, 510.) Hence, article I itself grants a right to freedom of speech, and does not merely safeguard some such right against encroachment.
Second, article I’s right to freedom of speech, unlike the First Amendment’s, is unbounded in range. It runs against the world, including private parties as well as governmental actors. (See Robins v. Pruneyard Shopping Center, supra, 23 Cal.3d at pp. 908-911; Fritz, More Than “Shreds and Patches”: California’s First Bill of Rights, supra, 17 Hastings Const. L.Q. at p. 31 [semble]; Friesen, Should California’s Constitutional Guarantees of Individual Rights Apply Against Private Actors?, supra, 17 Hastings Const. L.Q. at pp. 118, 119-122 [semble]; but see Feminist Women’s Health Center v. Blythe (1995) 32 Cal.App.4th 1641, 1665 [39 Cal.Rptr.2d 189] [stating in dictum that “[f]ree speech provisions of the state and federal Constitutions protect citizens from restrictions imposed by governmental action,” and that “[fjree speech concerns may be raised as a shield against injunctive relief only because the effectuation of such relief entails government action”].) An argument has been made that “it is the essential nature of constitutions that they are meant to restrain only” governmental actors and not private parties too. (Friesen, Should California’s Constitutional Guarantees of Individual Rights Apply Against Private Actors?, supra, 17 Hastings Const. L.Q. at p. 116, italics in original [referring to, but not embracing, such an argument]; see id. at pp. 122, fn. 41, 123, fn. 44, & 126, fn. 54 [similar].) But this argument overlooks the peculiar character of constitutions dating to the 19th century, which are not so narrow. (See Fritz, The American Constitutional Tradition Revisited: Preliminary Observations on State Constitution-Making *493 in the Nineteenth-Century West (1994) 25 Rutgers L.J. 945, 964-971.) Among such constitutions, ours must be numbered. (See Cal. Const, of 1849, art. XI, § 14 [expressly granting wives a right to separate property over against their husbands]; Cal. Const., art. XX, former § 8 (as adopted May 7, 1879) [impliedly granting husbands and wives a right to separate property the one against the other].)
Third, article I’s right to freedom of speech, unlike the First Amendment’s, is “unlimited” in scope. (Dailey v. Superior Court, supra, 112 Cal. at p. 97; see Aguilar v. Avis Rent A Car System, Inc. (1999) 21 Cal.4th 121, 143 [87 Cal.Rptr.2d 132, 980 P.2d 846] (lead opn. of George, C. J.) [semble: distinguishing Dailey on another point].) Whereas the First Amendment does not embrace all subjects, article I does indeed do so, in ipsissimis verbis: “Every person may freely speak, write and publish his or her sentiments on all subjects . . . .” (Cal. Const., art. I, § 2, subd. (a), italics added.) These words are “qualified only by” those that follow (Pines v. Tomson (1984) 160 Cal.App.3d 370, 393 [206 Cal.Rptr. 866] (per Arabian, J.)), which make anyone who “abuse[s] . . . this right” “responsible” for his misconduct (Cal. Const., art. I, § 2, subd. (a)).
Within its “unlimited” scope (Dailey v. Superior Court, supra, 112 Cal. at p. 97), which expressly embraces “all subjects” (Cal. Const., art. I, § 2, subd. (a)), article I’s right to freedom of speech protects political speech and ideological speech. (See Wilson v. Superior Court, supra, 13 Cal.3d at p. 658 [dealing with speech that was political in character]; People v. American Automobile Ins. Co., supra, 132 Cal.App.2d at pp. 318-328 [dealing with speech that was, at least in aspect, ideological in character].)
It is not otherwise with respect to article I’s right to freedom of speech and commercial speech. Which is to say, as we shall explain, the right in question protects such speech—surely so in the form of truthful and nonmisleading messages about lawful products and services, the kind with which we are here concerned.[4]
That article I’s right to freedom of speech protects commercial speech, at least in the form of truthful and nonmisleading messages about lawful *494 products and services, is implied through the specific language of the free speech clause in its precise setting. Again: “Every person may freely speak, write and publish his or her sentiments on all subjects,” with the sole qualification that anyone who “abuse[s] . . . this right” is “responsible” for his misconduct. (Cal. Const., art. I, § 2, subd. (a), italics added.) Plainly, this “wording . . . does not exclude” commercial speech from its “protection.” (Friesen, State Constitutional Law: Litigating Individual Rights, Claims and Defenses, supra, § 5-2(b)(4), p. 274.)
That article I’s right to freedom of speech protects commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services, is expressed in the broad context of the free speech clause in the world at large.
Let us focus initially on the circumstances surrounding article I’s free speech clause at its drafting for the original California Constitution of 1849.
Protection for commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services, must have practically been assumed at that time.
One fact is relevant by its absence: The United States Supreme Court had not yet introduced its commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence, and would not do so for almost a century.
More to the point, from the very moment of independence through 1849, American legislatures had kept commercial speech free from regulation by statute, except as to products and services that were unlawful in the jurisdiction in question, such as lotteries in New Jersey and Pennsylvania, horse racing in Connecticut and Pennsylvania, and unlicensed innkeeping in Rhode Island. (Troy, Advertising: Not “Low Value” Speech, supra, 16 Yale J. on Reg. at pp. 103-105.) And in the same period, American courts had similarly kept commercial speech free from regulation by common law, except as to messages that were false or misleading in their particulars, and then only to the extent that they were not immunized by the doctrine of caveat emptor. (Id. at p. 104; see id. at pp. 106-107.)[5] Facts of this sort should cause no surprise. Since colonial times, commercial speech, operating through advertising, had played a major role in the life of the press, *495 primarily as a source of revenue but also as a kind of editorial content, inasmuch as it was “thought to have independent value in educating and informing the reading public.” (Troy, Advertising: Not “Low Value” Speech, supra, 16 Yale J. on Reg. at p. 100; see 44 Liquormart, Inc. v. Rhode Island, supra, 517 U.S. at p. 495 [116 S.Ct. at p. 1504] (plur. opn. of Stevens, J.).) And, of course, since colonial times, the press had itself played a major role in the life of the polity. (Troy, Advertising: Not “Low Value ” Speech, supra, 16 Yale J. on Reg. at pp. 97-101; see Franklin, Apology for Printers (June 10, 1731), reprinted in 1 Papers of Benjamin Franklin (Labaree et al. edits. 1959) pp. 194-199.)
In California itself in 1849, the prevailing political, legal, and social culture was that of Jacksonian democracy. (See Fritz, More Than “Shreds and Patches”: California’s First Bill of Rights, supra, 17 Hastings Const. L.Q. at pp. 24-26, 33; Scheiber, Race, Radicalism, and Reform: Historical Perspective on the 1879 California Constitution (1989) 17 Hastings Const. L.Q. 35, 37.) Jacksonian democracy was animated by “ideals of equality and open opportunity.” (Scheiber, Race, Radicalism, and Reform: Historical Perspective on the 1879 California Constitution, supra, 17 Hastings Const. L.Q. at p. 37, fn. 8.) Those ideals worked themselves out in a “liberal, market-oriented, economic individualism.” (Johnson, Founding the Far West (1992) p. 57.) What such individualism presupposed, and produced, was wide and unrestrained speech about economic matters generally, including, obviously, commercial affairs. Remember the year—1849. “[Ajfter the discovery of gold in 1848,” “California attracted” a “rush of humanity.” (Fritz, Rethinking the American Constitutional Tradition: National Dimensions in the Formation of State Constitutions (1995) 26 Rutgers L.J. 969, 975.) These men—for they were largely men—were “essentially individualistic, greedy, and acquisitive gold-seekers.” (Ibid.) It was such who framed the original California Constitution, including article I’s free speech clause. (Fritz, Rethinking the American Constitutional Tradition: National Dimensions in the Formation of State Constitutions, supra, 26 Rutgers L.J. at p. 975.)
When we turn our eye to article I’s free speech clause at its drafting for the present California Constitution of 1879, we find no reason to reject protection for commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services. The language in 1879 was identical to that in 1849. The United States Supreme Court had not yet introduced its commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence, and would not do so for more than 60 years. In addition, the political, legal, and social culture of Jacksonian democracy had not passed, with its equality and open opportunity, economic individualism, and wide and unrestrained commercial speech. American *496 legislatures continued to keep commercial speech free from regulation by statute, except as to products and services that were unlawful in the jurisdiction in question. (Troy, Advertising: Not “Low Value” Speech, supra, 16 Yale J. on Reg. at pp. 111-113.) This was evidently true of the California Legislature, which kept commercial speech unregulated except for products and services that it made unlawful, such as lotteries (see Pen. Code, §§319-322, 324-326 (1872) [criminalizing lotteries]; id., § 323 (1872) [criminalizing the advertising thereof]), abortions (see id., former §§ 274-275 (1872) [criminalizing abortions]; id., former § 311, subd. 4 (1872) [criminalizing the advertising thereof]), and obscene or indecent books and other items (see id., former § 311, subd. 3 (1872) [criminalizing obscene or indecent books and other items]; id., former § 311, subd. 4 (1872) [criminalizing the advertising thereof]). American courts continued to keep commercial speech free from regulation by common law, except as to messages that were false or misleading in their particulars, and then only to the extent that they were not immunized by the doctrine of caveat emptor. (See Troy, Advertising: Not “Low Value” Speech, supra, 16 Yale J. on Reg. at pp. 104, 106, 111-113.) This was apparently true of California courts, for there is no indication in reported decisions to the contrary.
Proceeding from 1879 to 1974, when article I’s free speech clause was first amended, we again find no reason to reject protection for commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services. Although the numerical designation was different, the language was virtually identical. By 1974, the United States Supreme Court had introduced its commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence, and indeed had held that the First Amendment’s right to freedom of speech did not protect commercial speech at all. But there is no basis on which to conclude that the 1974 amendment of article I’s free speech clause incorporated what had transpired in the intervening years, including the United States Supreme Court’s First Amendment commercial speech/noncommercial speech dichotomy with its then nonprotection for commercial speech.
Advancing finally from 1974 to 1980, when article I’s free speech clause was last amended, we yet again find no reason to reject protection for commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services. Although the numerical designation was different, the language was absolutely identical. By 1980, the United States Supreme Court, while retaining its commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence, had made a volte-face to hold that the First Amendment’s right to freedom of speech did, in fact, protect commercial speech, albeit only somewhat. There is no *497 basis on which to conclude that the 1980 amendment of article I’s free speech clause incorporated what had transpired in the intervening years, including the United States Supreme Court’s First Amendment commercial speech/noncommercial speech dichotomy with its then, and current, “somewhat” protection for commercial speech.[6]
C
The first question that we address is, Does the California Plum Marketing Program, issued by the California Secretary of Food and Agriculture pursuant to the CMA, implicate Gerawan’s right to freedom of speech under the free speech clause of the First Amendment to the United States Constitution by compelling funding of generic advertising?
The answer that we give is, No.
At the threshold, we note what hardly needs noting. Although a corporation, Gerawan may at least be deemed to possess a First Amendment *498 right to freedom of speech, whether or not it does so strictly speaking. That is because the interests served by its commercial speech about its plums extend beyond itself. Such interests include those of its audience of “consumer[s],” who may or may not choose to buy its fruit. (Vd. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 763 [96 S.Ct. at p. 1826]; see Rubin v. Coors Brewing Co. (1995) 514 U.S. 476, 481-482 [115 S.Ct. 1585, 1589-1590, 131 L.Ed.2d 532].) Such interests also include those of “society” in general (Vd. Pharmacy Bd. v. Vd. Consumer Council, supra, 425 U.S. at p. 764 [96 S.Ct. at p. 1827]; see Rubin v. Coors Brewing Co., supra, 514 U.S. at p. 481 [115 S.Ct. at p. 1589]). The information so communicated is “indispensable to the proper allocation of resources in a free enterprise system” like ours (Vd. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 765 [96 S.Ct. at p. 1827]; accord, Rubin v. Coors Brewing Co., supra, 514 U.S. at p. 481 [115 S.Ct. at p. 1589]), because it literally “informs the numerous private decisions that drive the system” (Rubin v. Coors Brewing Co., supra, 514 U.S. at p. 481 [115 S.Ct. at p. 1589], italics added; accord, Vd. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at p. 765 [96 S.Ct. at p. 1827]).
As stated, the First Amendment’s right to freedom of speech protects commercial speech, albeit only somewhat in comparison with noncommercial speech, including that which is political or ideological in character. It is implicated in speaking itself. It may also be implicated in the use of money.
The First Amendment’s right to freedom of speech allows compelling one who engages in commercial speech to say through advertising what he otherwise would not say, even about a lawful product or service, in order to render his message truthful and not misleading. (See, e.g., Vd. Pharmacy Bd. v. Vd. Consumer Council, supra, 425 U.S. at pp. 771-772 [96 S.Ct. at pp. 1830-1831].) Consumer protection is the justification—apparently, the sole one. (See, e.g., Rubin v. Coors Brewing Co., supra, 514 U.S. at pp. 492-493 [115 S.Ct. at pp. 1594-1595] (cone. opn. of Stevens, J.); Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 771-772 [96 S.Ct. at pp. 1830-1831].) When the commercial speaker’s message is already truthful and nonmisleading, however, compulsion of speech is not supported by the consumer protection rationale, but must be supported, if at all, by some rationale applicable to all speech, noncommercial as well as commercial. (See, e.g., Rubin v. Coors Brewing Co., supra, 514 U.S. at pp. 492-493 [115 S.Ct. at pp. 1594-1595] (cone. opn. of Stevens, J.).)
Similarly, the First Amendment’s right to freedom of speech allows compelling one who engages in commercial speech to fund speech in the *499 form of advertising that he would otherwise not, even about a lawful product or service, in order to render his message truthful and not misleading. (See, e.g., Va. Pharmacy Bd. v. Va. Consumer Council, supra, 425 U.S. at pp. 771-772 [96 S.Ct. at pp. 1830-1831].) Again, consumer protection is the— apparently sole—justification. (See, e.g., Rubin v. Coors Brewing Co., supra, 514 U.S. at pp. 492-493 [115 S.Ct. at pp. 1594-1595] (cone. opn. of Stevens, L); Va. Pharmacy Bd. v. Va. Consumer. Council, supra, 425 U.S. at pp. 771-772 [96 S.Ct. at pp. 1830-1831.) When the commercial speaker’s message is already truthful and nonmisleading, however, compulsion of funding is not supported by the consumer protection rationale, but must be supported, if at all, by some rationale applicable to all speech, noncommercial as well as commercial. (Cf. Rubin v. Coors Brewing Co., supra, 514 U.S. at pp. 492-493 [115 S.Ct. at pp. 1594-1595] (cone. opn. of Stevens, J.) [dealing with compulsion of speech].)
It would therefore appear that, without more, the First Amendment’s right to freedom of speech would not allow compelling one who engages in commercial speech to say through advertising what he otherwise would not say, when his message is about a lawful product or service and is not otherwise false or misleading.
It would similarly appear that, without more, the First Amendment’s right to freedom of speech would not allow compelling one who engages in commercial speech to fund speech in the form of advertising that he would otherwise not, when his message is about a lawful product or service and is not otherwise false or misleading.
Appearances, however, deceive.
In Glickman, a majority sustained Marketing Order No. 917, issued by the United States Secretary of Agriculture pursuant to the AMAA, against a challenge by Gerawan, among others, that it violated their First Amendment right to freedom of speech by compelling funding of generic advertising.
At the outset, the Glickman majority “stress [ed] the importance of the . . . context” established by the AMAA. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469 [117 S.Ct. at p. 2138].) They also emphasized that Marketing Order No. 917 was a “detailed” “regulatory scheme” that had “displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully *500 protected by the antitrust laws.” (Ibid.)[7] It “compelled” Gerawan and the rest “to fund the generic advertising at issue . . . as a part of a broader collective enterprise in which their freedom to act independently” was “already constrained.” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469 [117 S.Ct. at p. 2138].)
The Glickman majority stated that the “central message of the generic advertising” under Marketing Order No. 917 was “that ‘California Summer Fruits’ are wholesome, delicious, and attractive to discerning shoppers.” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 462 [117 S.Ct. at p. 2135].) Such generic advertising was evidently intended not to prevent or correct any otherwise false or misleading message in the interest of consumer protection, but solely to develop markets and promote sales in the interest of producer welfare. (See id. at pp. 462, 475 [117 S.Ct. at pp. 2135, 2141].)
The Glickman majority went on to conclude that Marketing Order No. 917 did not even implicate, still less violate, the First Amendment right of Gerawan and the rest to freedom of speech by compelling funding of generic advertising. (See Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 468, 473-474, fn. 16, & 476 [117 S.Ct. at pp. 2140, fn. 16, & 2141-2142].) They considered the marketing order in question as merely a “species of economic regulation,” no more and no less, without any effect on the right at issue. (Id. at p. 477 [117 S.Ct. at p. 2142].) They “presume[d]” that Gerawan and the rest “agree[d] with the central message of the speech that [was] generated by the generic [advertising].” (Id. at p. 470 [117 S.Ct. at p. 2138].) They did not measure the marketing order against the right, but rather purported to “distinguish” the former out of the latter’s scope. (Id. at p. 469 [117 S.Ct. at p. 2138].)
Specifically, the Glickman majority said that Marketing Order No. 917 did not “impose[]” any “restraint” on any person’s freedom of speech (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469 [117 S.Ct. at p. 2138]): The fact that the order imposed “assessments for generic advertising,” which might “indirectly lead to a reduction in” one’s “individual advertising budget[,] does not itself amount to a restriction on speech.” (Id. at p. 470 [117 S.Ct. at p. 2139].)
The Glickman majority then said that Marketing Order No. 917 did not “compel any person to engage in any . . . speech” (Glickman v. Wileman *501 Brothers & Elliott, Inc., supra, 521 U.S. at p. 469 [117 S.Ct. at p. 2138]): It did not “require” anyone “to speak” himself or even “to be publicly identified or associated with another’s message.” (Id. at p. 471 [117 S.Ct. at p. 2139] .)
The Glickman majority said, finally and crucially, that Marketing Order No. 917 did not “compel” any person to fund any “political or ideological” speech (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 469-470 [117 S.Ct. at p. 2138]): The generic advertising amounted only to commercial speech, “encouraging consumers to buy” the fruit indicated (id. at p. 472 [117 S.Ct. at p. 2140]); it could not be “said to engender any crisis of conscience” in political or ideological matters (id. at p. 472 [117 S.Ct. at p. 2139]) or to “conflict with” anyone’s “ ‘freedom of belief’ ” in such areas (id. at p. 471 [117 S.Ct. at p. 2139]); any objection against the generic advertising as political or ideological in character, for instance, as “promoting] . . . ‘socialistic programs’ ” (id. at p. 467 [117 S.Ct. at p. 2137], fn. 10), was “trivial” (id. at p. 471 [117 S.Ct. at p. 2139]). Indeed, decisions such as Abood and its progeny, including Keller, stand for the proposition that a person who has lawfully been compelled to associate with others may be compelled to fund even political or ideological speech, without suffering a violation of his First Amendment right to freedom of speech, if the political or ideological speech in question is “ ‘germane’ to the purposes” that “ ‘justified’ ” the “ ‘compelled association’ ” in the first place. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 472-473 [117 S.Ct. at pp. 2139-2140].) The “test” of Abood and Keller would “clearly” be “satisfied in this case because ... the generic advertising ... is unquestionably germane to the purposes of the marketing order[] . . . .” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 473 [117 S.Ct. at p. 2140] .)
Speaking through the principal dissenting opinion, Justice Souter would have struck down Marketing Order No. 917 as violative of the First Amendment right of Gerawan and the rest to freedom of speech.
Justice Souter concluded that Marketing Order No. 917 did indeed implicate the First Amendment right of Gerawan and the rest to freedom of speech with respect to commercial speech. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 478-491 [117 S.Ct. at pp. 2142-2149] (dis. opn. of Souter, J.).)
Justice Souter found “doubtful” the Glickman majority’s “assumption” that Gerawan and the rest did not “disagree” with the generic advertising. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 488 [117 *502 S.Ct. at pp. 2147-2148] (dis. opn. of Souter, J.).) He then found any such lack of disagreement immaterial: What mattered was what speech a speaker chooses to fund or not to fund, not why he chooses to do so or not. (Id. at pp. 488-489 [117 S.Ct. atp p. 2147-2148] (dis. opn. of Souter, J.).)
As for the Glickman majority’s crucial assertion that Marketing Order No. 917 did not “compel” any person to fund any “political or ideological” speech (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 469-470 [117 S.Ct. at p. 2138]), Justice Souter observed that the First Amendment’s right to freedom of speech does not bar compelling a speaker to fund speech that he otherwise would not fund only when such speech would be political or ideological in character—only when, in other words, it would “engender” in him a “crisis of conscience” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 472 [117 S.Ct. at p. 2139]) or “conflict with” his “ ‘freedom of belief’ ” in such areas (id. at p. 471 [117 S.Ct. at p. 2139]): Prior decisions such as Abood and its progeny including Keller happened to arise in the context of political or ideological speech—a mere “fortuity”—but did not bar their application to commercial speech. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 488 [117 S.Ct. at p. 2147] (dis. opn. of Souter, J.).) The fact that, under such decisions, a person who has lawfully been compelled to associate with others may be compelled to fund even political or ideological speech without suffering a violation of the right in question does not mean that he can be so compelled without experiencing any implication of the right at all. (Id. at pp. 483-486 [117 S.Ct. at pp. 2145-2146] (dis. opn. of Souter, J.).)
Justice Souter then concluded that Marketing Order No. 917 was subject to examination under the Central Hudson test, which considers whether , a “regulation” restricting commercial speech (1) serves a “governmental interest” that is “substantial,” (2) “directly advances” such interest, and (3) is “not more extensive than . . . necessary” (Central Hudson Gas & Elec. v. Public Serv. Comm’n, supra, 447 U.S. at p. 566 [100 S.Ct. at p. 2351]). (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 491-492 [117 S.Ct. at pp. 2149-2150] (dis. opn. of Souter, J.).)
Justice Souter finally concluded that Marketing Order No. 917 did not survive muster under any of the three prongs of the Central Hudson test: The marketing order (1) did not serve a governmental interest that was “substantial,” as reflected in the fact that the AMAA’s authorization of provisions therein for advertising, whether generic or otherwise, had been relatively late and spotty; (2) did not “directly advance[]” any such interest; and (3) was not “narrowly tailored” in the service thereof. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 491 [117 S.Ct. at p. 2149] (dis. opn. *503 of Souter, J.); see id. at pp. 492-504 [117 S.Ct. at pp. 2149-2156] (dis. opn. of Souter, J.).)[8]
Speaking through his own dissenting opinion, Justice Thomas would also have struck down Marketing Order No. 917 as violative of the First Amendment right of Gerawan and the rest to freedom of speech. Unlike Justice Souter, he rejected the Central Hudson test in and of itself as too “lenient.” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 504 [117 S.Ct. at p. 2155] (dis. opn. of Thomas, J.).)
In sum, the Glickman majority’s analysis results from, and results in, the proposition that the First Amendment’s right to freedom of speech does not protect commercial speech against compelled funding. To quote Justice Souter, who was not challenged on the point, the Glickman majority simply found “no First Amendment right to be free of coerced subsidization of commercial speech” whatsoever. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. All [117 S.Ct. at p. 2142] (dis. opn. of Souter, J.).)
The soundness of the Glickman majority’s analysis is open to serious question.
In its own terms, the Glickman majority’s analysis lacks persuasiveness. Its legal component is driven not so much by principled reasoning as by ad hoc distinguishing. Its factual component is hardly better. For example, the majority’s express “presum[ption]” that Gerawan and the rest “agree[d] with the central message of the speech that [was] generated by the generic [advertising]” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 470 [117 S.Ct. at p. 2138]), to the effect that “ ‘California Summer Fruits’ are wholesome, delicious, and attractive to discerning shoppers” (id. at p. 462 [117 S.Ct. at p. 2135]), and their implied conclusion that such a “central message” (id. at p. 470 [117 S.Ct. at p. 2138]) is unexceptionable, appear to betray a certain lack of sophistication. To be sure, history has witnessed benefits accruing to producers of agricultural commodities from *504 generic advertising. But it has also witnessed burdens imposed on them as a result. By way of illustration, when some producers, like Gerawan, develop and use brands in marketing their goods, and others do not, the former may find themselves disadvantaged by generic advertising in their competition against the latter. Generic advertising may portray goods as “indistinctive” in spite of brand, and may thereby “minimize[] consumer desire to distinguish” inter se. (Comment, The Effect of Glickman v. Wileman Brothers & Elliott, Inc. on Nongeneric Commodities: A Narrow Focus on a Broad Rule (1999) 9 San Joaquin Agr. L.Rev. 95, 113.) Even when no producers develop or use brands in marketing their goods, some may find themselves disadvantaged by generic advertising in their competition against others. Generic advertising can be manipulated to serve the interests of some producers rather than others, as by allowing some to develop a kind of brand by means of funds assessed from all and then use it for their own exclusive benefit. Thus, in any given case, a producer who objects to generic advertising may not be attempting to ride free on the funds of others—a familiar charge—but may merely be making an effort to prevent others from hijacking his own funds as they drive to their own destination.
In addition, with virtual unanimity, commentators have subjected the Glickman majority’s analysis to extensive criticism. (See 2 Smolla & Nimmer, Freedom of Speech (1999) § 20:45, pp. 20-106 to 20-115; Fried, Perfect Freedom, Perfect Justice (1998) 78 B.U. L.Rev. 717, 743, fn. 84; Cásarez, Don’t Tell Me What to Say: Compelled Commercial Speech and the First Amendment (1998) 63 Mo. L.Rev. 929, 954-965; Comment, Glickman v. Wileman Brothers & Elliott, Inc.: Don’t Put Words in [M]y Mouth (1999) 33 New Eng. L.Rev. 989, 1004-1028; Comment, The Effect of Glickman v. Wileman Brothers & Elliott, Inc. on Nongeneric Commodities: A Narrow Focus on a Broad Rule, supra, 9 San Joaquin Agr. L.Rev. at pp. 100-107; Recent Developments—Free Speech and Freer Speech: Glickman v. Wileman Bros. & Elliott, Inc., 117 S.Ct. 2130 (1997) (1998) 21 Harv. J.L. & Pub. Pol’y 623, 624-637; Case Note, Constitutional Law—Forced Advertising: Free Speech or Not Even? Glickman v. Wileman Bros. & Elliott, Inc., 117 S.Ct. 2130 (1997) (1998) 33 Land & Water L.Rev. 779, 784-795; Note, Glickman v. Wileman Bros. & Elliot[t], Inc.: Has the Supreme Court Lost Its Way? (1998) 27 Stetson L.Rev. 1461, 1476-1494; The Supreme Court, 1996 Term—Leading Case (1997) 111 Harv. L.Rev. 197, 319-329; but see Kamenshine, Reflections on Coerced Expression (1999) 34 Land & Water L.Rev. 101, 108-110; Note, The Demise of a Workable Commercial Speech Doctrine: Dangers of Extending First Amendment Protection to Commercial Disclosure Requirements (1997) 76 Tex. L.Rev. 471, 501-502.)
For example, according to Professor Rodney Smolla, a noted scholar of the First Amendment, “[tjhe Glickman decision was an unfortunate blip *505 .... Justice Souter surely had the better of the argument. One can only hope that Glickman will someday prove to be an errant aberration, [and be] overruled .... The Court in Glickman appeared unable to get past conceptualizing the case before it as essentially one of agricultural and economic policy, and for that reason failed to apply conscientiously the First Amendment principles that ought to have resulted in” Marketing Order No. 917 “being struck down.” (2 Smolla & Nimmer, Freedom of Speech, supra, § 20:45, pp. 20-114 to 20-115.)
For his part, Charles Fried, who was formerly Solicitor General of the United States and is presently an Associate Justice of the Supreme Judicial Court of the Commonwealth of Massachusetts, has stated that “the Court in Glickman . . . did not see what Justice Souter pointed out in dissent, that the convergent analogies of’ prior cases “almost compelled a decision against the aspect of’ Marketing Order No. 917 that “the court upheld.” (Fried, Perfect Freedom, Perfect Justice, supra, 78 B.U. L.Rev. at p. 743, fn. 84.)
In the view of Professor Nicole Cásarez, “Glickman constitutes a serious departure from traditional commercial speech and compelled speech analysis. The majority’s contextual approach resulted in a house-of-cards opinion based on a faulty premise: that compelled commercial speech does not raise a First Amendment issue .... This premise overlooks three settled First Amendment principles: first, that compelled speech is just as constitutionally suspect as restricted speech; second, that paying for speech is constitutionally equivalent to speaking; and third, that commercial speech falls within the scope of the First Amendment.” (Cásarez, Don’t Tell Me What to Say: Compelled Commercial Speech and the First Amendment, supra, 63 Mo. L.Rev. at p. 960.)
All that we have said above, however, must be qualified by this: Although the soundness of the Glickman majority’s analysis is open to serious question, its authority is not. We shall therefore apply it here as we must.
In its amended complaint, Gerawan alleges facts, liberally construed, to the effect that it produces and handles plums; plums constitute a lawful product; it has developed, and uses, a brand for marketing purposes; it engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; it is nevertheless compelled by the California Plum Marketing Program to fund commercial speech in the form of generic advertising about plums as a commodity against its will; and the compulsion of funding reduces the amount of money available for its own advertising.
Under the Glickman majority’s analysis, Gerawan’s factual allegations are not sufficient even to implicate its First Amendment right to freedom of *506 speech against the California Plum Marketing Program for compelling funding of generic advertising.
Gerawan does not allege facts that would establish that the California Plum Marketing Program “imposes” any “restraint” on its freedom of speech. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469 [117 S.Ct. at p. 2138].) That the compulsion of funding of generic advertising for plums as a commodity may, as it alleges, reduce the amount of money available for its own advertising of its own branded plums is not enough. The Glickman majority stated plainly that any such “reduction . . . does not. . . amount to a restriction on speech.” (Id. at p. 470 [117 S.Ct. at p. 2139].) Gerawan no longer resists.
Neither does Gerawan allege facts that would establish that the California Plum Marketing Program “compel[s]” it “to engage in any . . . speech.” ('Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469 [117 S.Ct. at p. 2138].) Under the facts alleged, the California Plum Marketing Program does not “require” Gerawan “to speak” itself. (Id. at p. 471 [117 S.Ct. at p. 2139].) Gerawan does not assert that it does. Under the same facts, the California Plum Marketing Program does not “require” Gerawan “to be publicly identified or associated with” the California Plum Marketing Board’s “message.” (Ibid.) Here, Gerawan does indeed assert that it does. It assumes that “[m]ost consumers assume” that the board speaks on its behalf. Assumption upon assumption, however, does not amount to the allegation of a fact.
Lastly, Gerawan does not allege facts that would establish that the California Plum Marketing Program “compel[s]” it to fund any “political or ideological” speech. (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at pp. 469-470 [117 S.Ct. at p. 2138].) It alleges that it “disagrees” with, and indeed “abhors,” the generic advertising, otherwise undescribed, on both political and ideological grounds, as “socialistic” and “collectivist,” and also on commercial grounds, as “grouping all. . . plums as though they are the same” and as “embarrassingly silly, idiotic and/or totally ineffective.” It objects to the generic advertising, but does not even allege facts as to its specific content. Any aspects that “groupQ all . . . plums as though they are the same,” or that are “embarrassingly silly, idiotic and/or totally ineffective,” are commercial in character. Any aspects, however, that are “socialistic” and “collectivist” are indeed political or ideological. But they are not enough. The Glickman majority stated plainly that any objection against generic advertising as “ ‘ “promoting] . . . socialistic” ’ ”—or collectivist—“ ‘ “programs” ’ ” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 467, fn. 10 [117 S.Ct. at p. 2137]) has to be dismissed as “trivial” (id. at p. 471 [117 S.Ct. at p. 2139]).
*507 Against our conclusion, Gerawan argues that the Glickman majority’s analysis is, in fact, inapplicable. To no avail.
Gerawan initially attempts to distinguish the CMA, under which the California Plum Marketing Program was issued, from the AMAA, under which Marketing Order No. 917 was issued.
Although plainly not identical, the CMA and the AMAA, so far as the Glickman majority’s analysis is concerned, are not materially different. Since 1937, the AMAA’s underlying policies have included the establishing and maintaining of orderly marketing conditions for agricultural commodities in order to raise and support prices for their producers. The same is true of the CMA’s underlying policies. Since 1937, the AMAA has authorized marketing orders as regulations governing marketing matters for the producers and handlers of agricultural commodities. The same is true of the CMA. The AMAA’s authorization of provisions in marketing orders for advertising, whether generic or otherwise, has been relatively late and spotty. The same is not true, however, of the CMA, whose authorization of provisions in marketing orders for generic advertising has been broad and ab initio. This fact marks a difference—but not one that is material or, apparently, even favorable to Gerawan’s position.[9]
Gerawan then attempts to distinguish the California Plum Marketing Program itself from Marketing Order No. 917.
Gerawan quotes the Glickman majority’s statement: Marketing Order No. 917 was a “detailed” “regulatory scheme” that had “displaced many aspects of independent business activity that characterize other portions of the economy in which competition is fully protected by the antitrust laws,” and accordingly “compelled” Gerawan and the rest “to fund the generic advertising at issue . . . as a part of a broader collective enterprise in which their freedom to act independently” was “already constrained.” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 469 [117 S.Ct. at p. 2138].) Gerawan then maintains that the California Plum Marketing Program is not such a “detailed” “regulatory scheme.” (Ibid.)
*508 Although plainly not identical, the California Plum Marketing Program and Marketing Order No. 917, so far as the Glickman majority’s analysis is concerned, are not materially different. Marketing Order No. 917, among other things, provided for the undertaking, by the Plum Commodity Committee, of research and development projects, including advertising, and set out specific regulations regarding both fruit containers and packs and also fruit grades and sizes. The California Plum Marketing Program provides for the undertaking, by the California Plum Marketing Board, of research; advertising, specifically generic advertising, along with sales promotion and market development; and the institution and implementation of quality standards and inspections. It appears that a federal marketing order under the AMAA might have regulated more broadly and deeply than a state marketing order under the CMA. But Marketing Order No. 917 did not in fact regulate so much more broadly and deeply than the California Plum Marketing Program.
At bottom, Gerawan would have us characterize Marketing Order No. 917 as a regulation of economic activity with an incidental effect on speech and the California Plum Marketing Program as a regulation of speech with an incidental effect on economic activity. We cannot do so. Contrary to Gerawan’s assertion, the fact that the California Plum Marketing Program earmarks 55 percent of the funds assessed from producers for generic advertising along with sales promotion and market development, with only 35 percent for quality standards and inspections and only 10 percent for research, does not cause it to “stand[] alone ... as a regulation of speech.”[10]
*509 D
The second question that we address is, Does the California Plum Marketing Program, issued by the California Secretary of Food and Agriculture pursuant to the CMA, implicate Gerawan’s right to freedom of speech under the free speech clause of article I of the California Constitution by compelling funding of generic advertising?
The answer that we give is, Yes.
At the threshold, we note under article I’s free speech clause what we noted under the First Amendment’s. Although a corporation, Gerawan may at least be deemed to possess an article I right to freedom of speech, whether or not it does so strictly speaking. (People v. American Automobile Ins. Co., supra, 132 Cal.App.2d at pp. 322, 328 [semble].) The interests served by its commercial speech about its plums, as we have explained, extend beyond itself to those of its audience of consumers and further to those of society in general. (See Jacoby v. State Bar, supra, 19 Cal.3d at pp. 363, fn. 2, & 375-376.)
As stated, article I’s right to freedom of speech protects commercial speech, at least in the form of truthful and nonmisleading messages about lawful products and services. It is implicated in speaking itself. It may also be implicated in the use of money.
We shall assume that, with the justification of consumer protection, article I’s right to freedom of speech allows compelling one who engages in commercial speech to say through advertising what he otherwise would not say, even about a lawful product or service, in order to render his message truthful and not misleading.
We shall also assume that, with the justification of consumer protection, article I’s right to freedom of speech allows compelling one who engages in commercial speech to fund speech in the form of advertising that he would otherwise not, even about a lawful product or service, in order to render his message truthful and not misleading.
Even with such an assumption, article I’s right to freedom of speech, without more, would not allow compelling one who engages in commercial speech to say through advertising what he otherwise would not say, when his message is about a lawful product or service and is not otherwise false or misleading.
Similarly, even with such an assumption, article I’s right to freedom of speech, without more, would not allow compelling one who engages in *510 commercial speech to fund speech in the form of advertising that he would otherwise not, when his message is about a lawful product or service and is not otherwise false or misleading.
In its amended complaint, by way of restatement, Gerawan alleges facts, liberally construed, to the effect that it produces and handles plums; plums constitute a lawful product; it has developed, and uses, a brand for marketing purposes; it engages in commercial speech about its own branded plums through advertising; its message is not false or misleading; it is nevertheless compelled by the California Plum Marketing Program to fund commercial speech in the form of generic advertising about plums as a commodity against its will; and the compulsion of funding reduces the amount of money available for its own advertising.
Under the law as set forth above, Gerawan’s factual allegations are sufficient at least to implicate its article I right to freedom of speech against the California Plum Marketing Program for compelling funding.,of generic advertising. Gerawan’s commercial speech about its own branded plums through advertising concerns a lawful product, and is not itself false or misleading. Yet, the California Plum Marketing Program compels it to fund, against its will, commercial speech in the form of generic advertising about plums as a commodity—generic advertising that is intended not to prevent or correct any otherwise false or misleading message in the interest of consumer protection, but solely to develop markets and promote sales in the interest of producer welfare.
Against our conclusion, the Secretary of Food and Agriculture argues, in reliance on People v. Teresinski (1982) 30 Cal.3d 822 [180 Cal.Rptr. 617, 640 P.2d 753] (hereafter sometimes Teresinski), that there are “no reasons . . . to justify rejecting” the Glickman majority’s construction of the First Amendment’s free speech clause as our construction of article I’s. (People v. Teresinski, supra, 30 Cal.3d at p. 836.)
In Teresinski, the presence of all four of the following facts counseled against rejection of a decision of the United States Supreme Court there considered: First, “nothing in the language or history of the California” constitutional provision in question “suggested] that the issue before us should be resolved differently than under” the analogous federal constitutional “provision.” (People v. Teresinski, supra, 30 Cal.3d at p. 836.) Second, the decision in question “did not overrule past precedent or limit previously established rights under” the United States Constitution. (People v. Teresinski, supra, 30 Cal.3d at p. 836.) Third, the decision “was unanimous, and ha[d] not inspired extensive criticism.” (Id. at pp. 836-837.) Fourth, the *511 decision, “if followed by the courts of this state, would not overturn established California doctrine affording greater rights” in the particular area. (Id. at p. 837.)
Here, by contrast, the absence of at least two of these four facts counsels in favor of rejection of the Glickman majority’s analysis.
As for the fourth fact, counting from last to first, we acknowledge that the Glickman majority’s analysis, “if followed by the courts of this state, would not overturn established California doctrine affording greater rights” in the area of commercial speech under article I’s free speech clause. (People v. Teresinski, supra, 30 Cal.3d at p. 837.) Such a result, however, is attributable solely to the fact that the precise issue here is one of first impression.
As for the third fact, however, we must observe that the Glickman majority’s analysis was far from “unanimous” (People v. Teresinski, supra, 30 Cal.3d at p. 836): It garnered the support of only five of the court’s nine members, and provoked two of them to write dissenting opinions. We must also observe that the Glickman majority’s analysis has in fact “inspired extensive criticism” (People v. Teresinski, supra, 30 Cal.3d at pp. 836-837): The various treatises, articles, comments, notes, and case notes cited above stand as proof.
As for the second fact, we concede that, strictly speaking, the Glickman majority’s analysis “did not overrule past precedent or limit previously established rights under” the First Amendment’s free speech clause. (People v. Teresinski, supra, 30 Cal.3d at p. 836.) Such a result, however, is attributable solely to the fact that the precise issue there was one of first impression. All the same, the Glickman majority’s analysis did indeed do violence to the law that it took into its hands. Professor Smolla: “The Court in Glickman . . . failed to apply conscientiously the First Amendment principles that ought to have resulted in” Marketing Order No. 917 “being struck down.” (2 Smolla & Nimmer, Freedom of Speech, supra, § 20:45, pp. 20-114 to 20-115.) Former Solicitor General and now Justice Fried: “[T]he Court in Glickman . . . did not see what Justice Souter pointed out in dissent, that the convergent analogies of’ prior cases “almost compelled a decision against the aspect of’ Marketing Order No. 917 that “the court upheld.” (Fried, Perfect Freedom, Perfect Justice, supra, 78 B.U. L.Rev. at p. 743, fn. 84.) Professor Cásarez: “[0]veriook[ing] . . . settled First Amendment principles,” “Glickman constitutes a serious departure from traditional commercial speech and compelled speech analysis.” (Cásarez, Don’t Tell Me What to Say: Compelled Commercial Speech and the First Amendment, supra, 63 Mo. L.Rev. at p. 960.)
*512 As for the first fact, we cannot agree that “nothing in the language or history of’ article I’s free speech clause “suggests that the issue before us should be resolved differently than under” the First Amendment’s as construed by the Glickman majority. (People v. Teresinski, supra, 30 Cal.3d at p. 836.) Indeed, as we have shown, practically everything in such language and history mandates a different resolution.
Focusing on language more than history, the Secretary of Food and Agriculture claims that, for present purposes, article I’s free speech clause is not materially different from the First Amendment’s.
The secretary’s point has been anticipated by our analysis above, which sets out the specific language of article I’s free speech clause in its precise setting and also its broad context in the world at large, and must yield to its force.
The secretary nevertheless attempts to make article I’s free speech clause similar to the First Amendment’s, thus: The first sentence of article I’s free speech clause—“Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right” (Cal. Const., art. I, § 2, subd. (a))—is “not implicated in this case” because it assertedly grants only a right to freedom of speech, most narrowly defined, and then only against prior restraint. The second sentence of article I’s free speech clause—“A law may not restrain or abridge liberty of speech or press” (Cal. Const., art. I, § 2, subd. (a))—is indeed implicated, and it is equivalent to the First Amendment’s free speech clause.
The secretary’s attempt to make article I’s free speech clause similar to the First Amendment’s collapses onto itself.
On its face, the secretary’s attempt is essentially an application of brute force. It simply removes what is unique to article I’s free speech clause vis-á-vis the First Amendment’s, and keeps what is common. It is different in degree, but not in kind, from making over section 5 of article I of the California Constitution, which states that a “standing army may not be maintained in peacetime,” into clause 12 of section 8 of article I of the United States Constitution, which implies that such an army may indeed be maintained, through the simple expedient of deleting the adverbial particle “not.”
Furthermore, in its substance, the secretary’s attempt proves unpersuasive. It appears to be rooted in the assertion, referred to above, that article I’s free speech clause grants only a right to freedom of speech, most narrowly defined, and then only against prior restraint.
*513 We must, however, reject any suggestion by the secretary that article I’s free speech clause cannot be implicated in the use of money, but is implicated solely in speaking itself. As stated, even if money is not itself speech, it nevertheless enables speech.
We must also reject any suggestion by the secretary that article I’s free speech clause does not grant a right to refrain from speaking at all as well as a right to speak freely. Again, speech results from what a speaker chooses not to say in addition to what he chooses to say. The secretary appears to argue, syllogistically, as follows: A right that cannot be “abuse[dj” does not exist (Cal. Const., art. I, § 2, subd. (a)); the right to refrain from speaking cannot be abused; therefore, the right to refrain from speaking does not exist. The conclusion does not follow because the minor premise, at least, is unsound. So far as commercial speech is concerned, and on the assumption that article I’s right to freedom of speech does not protect commercial speech in the form of false or misleading messages about even lawful products or services,[11] the right not to speak can surely be abused, and is in fact abused, whenever the speaker fails to speak and thereby renders his message false or misleading. (Cf. Griset v. Fair Political Practices Com., supra, 8 Cal.4th at p. 866, fn. 5 [implying, in dictum, that failure on the part of a political candidate to identity himself in a mass mailing may amount to abuse of the right not to speak].)
We must similarly reject any suggestion by the secretary that article I’s free speech clause does not grant a right to refrain from funding speech altogether as well as a right to fund speech meaningfully. Again, speech results, through money’s enabling, from what speech a speaker chooses not to fund in addition to what speech he chooses to fund. The secretary apparently makes the same syllogistic argument as described above, with the same result.
In addition, we must reject any suggestion by the secretary that article I’s free speech clause grants a right to freedom of speech only against prior restraint. True, it does indeed grant a right against prior restraint.[12] But without any limitation thereto. Certainly, that article I’s free speech clause grants a right to freedom of speech against prior restraint does not preclude a right against what we may call “subsequent punishment.” Indeed, it effectively grants a right against subsequent punishment by effectively conferring immunity, save only for “abuse” (Cal. Const., art. I, § 2, subd. *514 (a)). Moreover, a right against prior restraint could prove empty without a right against subsequent punishment, inasmuch as subsequent punishment might cause the speaker to impose a “prior restraint,” as it were, on himself, totally apart from even the threat of imposition of any prior restraint, properly so called, by another. Likewise, that article I’s free speech clause grants a right to freedom of speech against prior restraint does not preclude a right against what we may call “prior compulsion.” One does not speak freely when one is restrained from speaking. But neither does one speak freely when one is compelled to speak. Perhaps restraint has figured historically as a more familiar evil. But compulsion does not present itself analytically as a less pernicious one.
For all of these reasons, we must, and do, reject the Glickman majority’s construction of the First Amendment’s free speech clause as our construction of article I’s. As stated, the Glickman majority’s analysis results from, and results in, the proposition that the First Amendment’s right to freedom of speech does not protect commercial speech against compelled funding. Any such proposition is simply untenable with respect to article I’s. The Glickman majority found “no . . . right” whatsoever under the First Amendment “to be free of coerced subsidization of commercial speech.” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. All [117 S.Ct. at p. 2142] (dis. opn. of Souter, J.).) We cannot so find under article I.
With that said, we must in fairness own to the force of a sentiment that appears to inform the Glickman majority’s analysis. De minimis non curat lex is a maxim of ancient origin, “old” even in the infancy of the nation. (Ware v. Hylton (1796) 3 U.S. (3 Dall.) 199, 268 [1 L.Ed.568, 597-598] (opn. of Iredell, J.).) It seems applicable to the First Amendment’s free speech clause. (See Ellis v. Railway Clerks (1984) 466 U.S. 435, 456 [104 S.Ct. 1883, 1896-1897, 80 L.Ed.2d 428]; Lehnert v. Ferris Faculty Assn., supra, 500 U.S. at p. 559 [111 S.Ct. at pp. 1979-1980] (cone. & dis. opn. of Scalia, J.) [characterizing Ellis as recognizing a “de minimis exception”]; see generally Konigsberg v. State Bar, supra, 366 U.S. at pp. 50-51 [81 S.Ct. at pp. 1006-1007].) In our view, it seems applicable as well to article I’s. Under its operation, we might conclude that, in a given case, compelling funding of commercial speech, including generic advertising, does not implicate any right to freedom of speech under article I if the funding compelled and/or the commercial speech resulting therefrom are de minimis. In this case, the facts alleged are to the effect that the California Plum Marketing Program is devoted largely to commercial speech in the form of generic advertising and to compelling funding therefor, earmarking 55 percent of such funding to the underlying activity; it compels Gerawan itself to fund commercial speech in the form of generic advertising in excess of $80,000 per year; and it then *515 engages in such speech in such form in excess of such amount from Gerawan’s money alone. Under facts like those alleged here—we know not what facts may one day be proved—we cannot conclude that compelling funding of commercial speech, including generic advertising, does not implicate any right to freedom of speech under article I.[13]
IV
We turn now to the decision of the Court of Appeal, which affirmed the judgment of the superior court on its order granting, without leave to amend, the motion for judgment on the pleadings submitted by the California Secretary of Food and Agriculture on the ground that Gerawan’s amended complaint did not allege facts sufficient to constitute a cause of action.
At the threshold, we believe that the Court of Appeal was right to subject the superior court’s order granting the motion for judgment on the pleadings, as it apparently did, to independent review. Such a ruling is so scrutinized. (Smiley v. Citibank, supra, 11 Cal.4th at p. 146 [common law motion]; see Schabarum v. California Legislature (1998) 60 Cal.App.4th 1205, 1216-1217 [70 Cal.Rptr.2d 745] [statutory motion].) It resolves a mixed question of law and fact that is predominantly one of law, viz., whether or not the factual allegations that the plaintiff makes are sufficient to constitute a cause of action. (Smiley v. Citibank, supra, 11 Cal.4th at p. 145 [common law motion].) The resolution of a question of this sort calls for examination de novo. (Id. at p. 146 [same].)
On the merits, however, we believe that the Court of Appeal was wrong to sustain the superior court’s order granting the motion for judgment on the pleadings.
A trial court’s determination of a motion for judgment on the pleadings accepts as true the factual allegations that the plaintiff makes. (Smiley v. Citibank, supra, 11 Cal.4th at p. 146 [common law motion]; see Inter-Modal Rail Employees Assn. v. Burlington Northern & Santa Fe Ry. Co. (1999) 73 Cal.App.4th 918, 924 [87 Cal.Rptr.2d 60] [statutory motion].) In addition, it *516 gives them a liberal construction. (See American Airlines, Inc. v. County of San Mateo (1996) 12 Cal.4th 1110, 1118 [51 Cal.Rptr.2d 251, 912 P.2d 1198] [without specification to common law or statutory motion]; Inter-Modal Rail Employees Assn. v. Burlington Northern & Santa Fe Ry. Co., supra, 73 Cal.App.4th at p. 924 [statutory motion].)
An appellate court’s consideration of the ensuing determination by the trial court involves the same acceptance and liberal construction of the factual allegations in question. (American Airlines, Inc. v. County of San Mateo, supra, 12 Cal.4th at p. 1118 [without specification to common law or statutory motion]; Inter-Modal Rail Employees Assn. v. Burlington Northern & Santa Fe Ry. Co., supra, 73 Cal.App.4th at p. 924 [statutory motion].)
The Court of Appeal sustained the superior court’s order granting the motion for judgment on the pleadings because it concluded that the California Plum Marketing Program does not implicate Gerawan’s right to freedom of speech under either the First Amendment’s free speech clause or article I’s.
We agree with the Court of Appeal in its conclusion that the California Plum Marketing Program does not implicate Gerawan’s right to freedom of speech under the First Amendment’s free speech clause, as construed by the Glickman majority, by compelling funding of generic advertising. As we have explained, the California Plum Marketing Program, and the CMA pursuant to which it was issued, are not materially different for present purposes from Marketing Order No. 917, or from the AMAA pursuant to which it was issued. Marketing Order No. 917 was sustained by the Glickman majority. The California Plum Marketing Program must be sustained by us.
But we do not agree with the Court of Appeal in its conclusion that the California Plum Marketing Program does not implicate Gerawan’s right to freedom of speech under article I by compelling funding of generic advertising. As we have also explained, article I’s free speech clause is indeed materially different for present purposes from the First Amendment’s. The Court of Appeal attempted to render article I’s free speech clause similar to the First Amendment’s by construing article I’s free speech clause as it believed other courts had construed the First Amendment’s. It construed article I’s free speech clause thus under a “so-called ‘principle of deference,’ ” which it said operates when a state constitutional provision is “ ‘similar’ ” in its “ ‘language’ ” to a federal constitutional provision. (Quoting Raven v. Deukmejian, supra, 52 Cal.3d at p. 353.) The “principle” referred to, however, is only “general” and not inexorable; the *517 “deference” indicated merely counsels “voluntar[y]” respectful consideration and does not “mandate . . . blind obedience.” (Ibid., italics omitted.) In any event, the language of article I’s free speech clause is simply not similar to the First Amendment’s. Rather, as shown, it “differs from” it substantially. (Los Angeles Alliance for Survival v. City of Los Angeles, supra, 22 Cal.4th at p. 365; accord, Dailey v. Superior Court, supra, 112 Cal. at p. 97.)
With our conclusion that the California Plum Marketing Program does indeed implicate Gerawan’s right to freedom of speech under article I, we bring the task before us to an end. The Court of Appeal’s conclusion to the contrary was necessary to its judgment. The former cannot stand. The latter must therefore fall.
Our conclusion, however, brings no conclusion to this cause. That the California Plum Marketing Program implicates Gerawan’s right to freedom of speech under article I does not mean that it violates such right. But it does indeed raise the question. That question, in turn, raises others, including what test is appropriate for use in determining a violation. And that question, in its turn, raises still others as well, including what protection, precisely, does article I afford commercial speech, at what level, of what kind, and, perhaps “most difficult,” subject to what test (Spiritual Psychic Science Church v. City of Azusa, supra, 39 Cal.3d at p. 513). To address such questions belongs, in the first instance, to the Court of Appeal on remand. It did not reach beyond the issue whether the California Plum Marketing Program implicates Gerawan’s right to freedom of speech under article I when the cause was before it originally. It will have the opportunity, and the obligation, to do so when the cause returns following our judgment.[14]
V
For the reasons stated above, we conclude that we must vacate the judgment of the Court of Appeal, and remand the cause to that court for further proceedings not inconsistent with this opinion.
It is so ordered.
Kennard, J., Werdegar, J., and Brown, J., concurred.

Namely, “almonds, filberts (otherwise known as hazelnuts), California-grown peaches, cherries, papayas, carrots, citrus fruits, onions, Tokay grapes, pears, dates, . . . nectarines, celery, sweet com, limes, olives, pecans, eggs, avocadoes, apples, raisins, walnuts, tomatoes, . . . Florida grown strawberries, [and] cranberries.” (7 U.S.C. 608c(6)(I).)

Since 1994, motions for judgment on the pleadings have been authorized by statute. (Stats. 1993, ch. 456, § 5, pp. 2524-2527, adding Code Civ. Proc., § 438; Stats. 1994, ch. 493, § 2, amending Code Civ. Proc., § 438.) Previously, they were allowed by common law. (See Smiley v. Citibank (1995) 11 Cal.4th 138, 143 [44 Cal.Rptr.2d 441, 900 P.2d 690], affd. (1996) 517 U.S. 735 [116 S.Ct. 1730, 135 L.Ed.2d 25]; see also Ott v. Alfa-Laval Agri, Inc. (1995) 31 Cal.App.4th 1439, 1447 [37 Cal.Rptr.2d 790].) Generally, as such motions were, so they remain.

By our leave, numerous entities have submitted briefs as amici curiae supporting either Gerawan’s position or that of the Secretary of Food and Agriculture, either in whole or in part, including the American Federation of Labor and Congress of Industrial Organizations, the California Apple- Commission et al., the California Asparagus Commission et al., the California Table Grape Commission et al., the Center for Individual Freedom, Matsui Nursery, Inc., et al., the State Bar of California, the Sun-Maid Growers of California, the Washington Legal Foundation, and Wileman Bros. & Elliott, Inc. In conjunction with its brief, the State Bar of California requests us to take judicial notice of a tentative decision, which is evidently now final, in Brosterhous v. State Bar of California (Super. Ct. Sac. County, 1999, No. 95AS03901). We hereby grant the request. As a “reviewing court” (Evid. Code, § 459, subd. (a)), we may take judicial notice of the “[r]ecords of. . . any court of this state” (id., § 452, subd. (d)). We do so with respect to the tentative decision, which is included therein.

Excepting, perhaps, other sorts of messages about other sorts of products or services. (See Friesen, State Constitutional Law: Litigating Individual Rights, Claims and Defenses (2d ed. 1996) § 5-2(b)(4), p. 274 [allowing such an exception if supported by “[h]istory in a particular state”]; see generally Troy, Advertising: Not “Low Value" Speech (1999) 16 Yale J. on Reg. 85, 87-144 [providing such “history,” although largely outside of California]; see also In re Morse (1995) 11 Cal.4th 184, 200, fn. 4 [44 Cal.Rptr.2d 620, 900 P.2d 1170] [stating in dictum that “we see no reason why” an attorney’s “misleading advertisements would be protected commercial speech under” article I’s free speech clause].)

See Hamilton, The Ancient Maxim Caveat Emptor (1931) 40 Yale L.J. 1133, 1186 (stating that, in the course of the 19th century in the United States, the “common sense of individualism won for” the doctrine of caveat emptor “judicial acceptance, fitted it out with legal trappings, and made it a vehicle of public policy”; “judges discovered] that [the doctrine] sharpened wits, taught self-reliance, [and] made a man—an economic man—out of the buyer”).

We recognize that our conclusions concerning article I’s free speech clause and commercial speech, which are set out in the text, have not been anticipated completely and in their entirety in prior California judicial decisions. That is because article Fs free speech clause and commercial speech were not considered on their own terms in any of these prior decisions, but only, for example, through the distorting lens of the United States Supreme Court’s commercial speech/noncommercial speech dichotomy in First Amendment jurisprudence. (See, e.g., Leoni v. State Bar (1985) 39 Cal.3d 609, 614, fn. 2, & 622-628 [217 Cal.Rptr. 423, 704 P.2d 183] [dealing with commercial speech under both article I’s free speech clause and the First Amendment’s, but, in effect, construing and applying only the First Amendment’s free speech clause and not article I’s]; Metromedia, Inc. v. City of San Diego (1980) 26 Cal.3d 848, 866-871 [164 Cal.Rptr. 510, 610 P.2d 407], revd. sub nom. Metromedia, Inc. v. San Diego (1981) 453 U.S. 490 [101 S.Ct. 2882, 69 L.Ed.2d 800] [same]; Jacoby v. State Bar, supra, 19 Cal.3d at pp. 363, fn. 2, & 366-380 [same]; Welton v. City of Los Angeles (1976) 18 Cal.3d 497, 503-504 [134 Cal.Rptr. 668, 556 P.2d 1119] [dealing with commercial speech solely under the First Amendment’s free speech clause]; Wirta v. Alameda-Contra Costa Transit Dist. (1967) 68 Cal.2d 51, 54, 57 [64 Cal.Rptr. 430, 434 P.2d 982] [citing article Fs free speech clause,-but dealing with commercial speech solely under the First Amendment’s]; McKay Jewelers, Inc. v. Bowron (1942) 19 Cal.2d 595, 596, 604-605 [122 P.2d 543,139 A.L.R. 1188] [dealing with commercial speech apparently under article Fs free speech clause as well as under the First Amendment’s]; Loska v. Superior Court (1986) 188 Cal.App.3d 569, 581-584 [233 Cal.Rptr. 213] [dealing with commercial speech under both article Fs free speech clause and the First Amendment’s, but, in effect, construing and applying only the First Amendment’s free speech clause and not article I’s]; Women’s Intemat. League etc. Freedom v. City of Fresno (1986) 186 Cal.App.3d 30, 33-42 [237 Cal.Rptr. 577] [dealing with political speech over against commercial speech under article I’s free speech clause]; In re Mares (1946) 75 Cal.App.2d 798, 802-805 [171 P.2d 762] [dealing with commercial speech under the First Amendment’s free speech clause and perhaps also under article I’s]; Pittsford v. City of Los Angeles (1942) 50 Cal.App.2d 25, 27, 31-39 [122 P.2d 535] [citing article Fs free speech clause, but dealing with commercial speech under the First Amendment’s alone]; People v. Osborne (1936) 17 Cal.App.2d Supp. 771, 778 [dealing with commercial speech under the otherwise unspecified “constitutional liberty of speech,” which may refer to article I’s free speech clause and perhaps also the First Amendment’s].)

We note in passing that the Glickman majority stated that marketing orders issued by the Secretary of Agriculture pursuant to the AMAA are “expressly exempted from the antitrust laws.” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 461 [117 S.Ct. at p. 2134], citing 7 U.S.C. § 608b.) Incorrectly. What are exempted, impliedly if not expressly, are not marketing orders, but rather marketing agreements. (7 U.S.C. § 608b(a).)

Without contradiction by the Glickman majority, Justice Souter noted that generic advertising under Marketing Order No. 917 did not “represent so-called ‘government speech,’ with respect to which the Government may have greater latitude in selecting content than otherwise permissible under the First Amendment. . . .” (Glickman v. Wileman Brothers & Elliott, Inc., supra, 521 U.S. at p. 482, fn. 2 [117 S.Ct. at p. 2144] (dis. opn. of Souter, J.).) “Government speech” is, somewhat tautologically, speech by the government itself concerning public affairs. (See Keller v. State Bar of California, supra, 496 U.S. at p. 10 [110 S.Ct. at p. 2234]; Abood v. Detroit Board of Education, supra, 431 U.S. at p. 259, fn. 13 [97 S.Ct. at pp. 1811-1812] (cone. opn. of Powell, J.).) It does not appear to cover generic advertising under a federal marketing order, which is not so much a mechanism of regulation of the producers and handlers of an agricultural commodity by a governmental agency, as a mechanism of self-regulation by the producers and handlers themselves.

Accord, Gallo Cattle Co. v. California Milk Advisory Bd. (9th Cir. 1999) 185 F.3d 969, 974-975 (concluding to the effect that, so far as the Glickman majority’s analysis is concerned, the CMA is not materially different from the AMAA).
In apparent contrast to both the AMAA and the CMA is the Mushroom Promotion, Research, and Consumer Information Act of 1990 (Pub.L. No. 101-624, tit. XIX, § 1921 et seq. (Nov. 28, 1990) 104 Stat. 3854 et seq., as amended, codified at 7 U.S.C. § 6101 et seq.), which has been characterized as “basically a commercial advertising statute designed to assess mushroom growers for the cost of advertising” (United Foods, Inc. v. U.S. (6th Cir. 1999) 197 F.3d 221, 222, fn. 1, cert, granted Nov. 27, 2000, No. 00-276, _ U.S. _ [121 S.Ct. 562, 148 L.Ed.2d 482, 2000 WL 1210591, 69 U.S.L.Week 3157]).

Compare Cal-Almond Inc. v. U.S. Dept. ofAgr. (9th Cir. 1999) 192 F.3d 1272, 1274-1277 (concluding to the effect that, so far as the Glickman majority’s analysis is concerned, the Marketing Order for Almonds Grown in California (7 C.F.R. § 981 (1999) [semble: not specifying the date of the order in question]), which was issued under the AMAA, is not materially different from Marketing Order No. 917); Gallo Cattle Co. v. California Milk Advisory Bd., supra, 185 F.3d at pages 974-975 (concluding to similar effect as to the Marketing Order for Research, Education and Promotion of Market Milk and Dairy Products in California, which was issued under the CMA); Goetz v. Glickman (10th Cir. 1998) 149 F.3d 1131, 1138-1139 (concluding to similar effect as to the Beef Promotion and Research Order (7 C.F.R. § 1260A (1998) [semble: not specifying the date of the order in question]), which was issued under the Beef Promotion and Research Act of 1985 (Pub.L. No. 99-198, tit. XVI, § 1601 et seq. (Dec. 23, 1985) 99 Stat. 1597 et seq., as amended, codified at 7 U.S.C. § 2901 et seq.).
In apparent contrast to both Marketing Order No. 917 and the California Plum Marketing Program is the Mushroom Promotion, Research, and Consumer Information Order (7 C.F.R. § 1209 (1999) [semble: not specifying the date of the order in question]), which has been said to leave the “market in mushrooms” “relatively free,” “[ejxcept for [a] compelled advertising program assessing growers” to cover related expenses (United Foods, Inc. v. U.S., supra, 197 F.3d at p. 223). See ante, at page 507, footnote 9.

See ante, at page 493, footnote 4.

See Werner v. Southern Cal. etc. Newspapers (1950) 35 Cal.2d 121, 124 [216 P.2d 825, 13 A.L.R.2d 252] (stating in dictum that the “primary purpose” of article I’s free speech clause is “to guarantee that freedom of speech shall not be restrained except to prevent abuse”).

Whether, and how, article I’s free speech clause may accommodate government speech (see ante, at p. 502, fn. 8) is a question that we need not, and do not, answer. In its amended complaint, Gerawan did not allege facts that would show that generic advertising under the California Plum Marketing Program—which is not so much a mechanism of regulation of the producers and handlers of an agricultural commodity by a governmental agency, as a mechanism of self-regulation by the producers and handlers themselves—amounts to speech of this sort. Neither did the Secretary of Food and Agriculture so claim in his motion for judgment on the pleadings. At oral argument, counsel for certain of the amici curiae supporting the secretary’s position attempted to raise the point. Too little, too late.

Because of the result that we reach, we need not, and do not, address the issue, which was raised before the superior court and the Court of Appeal, whether the California Plum Marketing Program implicates Gerawan’s right to freedom of association under either the First Amendment or article I by compelling funding of generic advertising.